IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31053-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MELINDA R. BARRERA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Robert Nelson died on December 7, 2011 from a gunshot wound to his chest and stomach. The State charged Melinda Barrera and David McLaughlin with second degree murder for causing Nelson's death. A jury found only Barrera guilty. The trial court sentenced Barrera to 224 months' confinement, including consecutive sentence enhancements; 60 months for using a firearm; and 24 months for using a deadly weapon. On appeal, Barrera contends: the trial court erred by not providing a *Petrich* instruction on unanimity; by imposing a deadly weapon sentence enhancement that exceeded the jury's special verdict findings; and by instructing the jury that "deadly weapon" includes a firearm.

## FACTS

Some background of Robert Nelson and his living situation is helpful. At his death, Robert Nelson was 46 years old, stood 6 foot 2 inches, and weighed 312 pounds. Nelson injured his back during his youth rendering it difficult for him to walk. He usually hobbled, and sometimes used a wheelchair. Nelson spent most of his time in his Spokane apartment and generally allowed anyone to pass time there. Melinda Barrera and David McLaughlin were Robert Nelson's neighbors in the apartment complex. Barrera often provided Robert Nelson assistance, and, at Nelson's request, she occasionally asked people to leave Nelson's apartment. Fighting and yelling were common in Nelson's apartment.

Multiple people witnessed the events leading to Robert Nelson's death. At trial, A.B.,[1] M.C., Misty Warden and appellant Barrera testified to their observations. David McLaughlin did not testify. Barrera, A.B. and M.C. agreed, during testimony, to not having respectively initially reported the truth to law enforcement.

Misty Warden sometimes assisted Robert Nelson. She met him years earlier because her uncle and Nelson were best friends. Warden sometimes slept on Nelson's bedroom floor. Warden sat in Nelson's living room during the evening of December 7, 2011.

---

[1] A.B. and M.C. are both teenagers. Pursuant to the June 18, 2012 general order of this court, we refer to them only by their initials.

2

On December 7, 2011, teenage female A.B. lived with Melinda Barrera and David McLaughlin in their apartment. That evening Barrera asked A.B. to leave the apartment so that McLaughlin and Barrera could spend some time alone. A.B. did not know Robert Nelson well, but occasionally spent time in his apartment. A.B. went to Nelson's apartment where she found Nelson and his roommate, Michael Dennis, arguing. A.B. yelled at Nelson and Dennis to stop arguing. Dennis left the apartment.

While in his apartment bedroom but near the living room, Robert Nelson yelled at A.B., called her a bitch, and instructed her to shut up. A.B. responded by yelling at Nelson to shut up. Nelson approached close to A.B., who was in the living room. A.B. backed towards the apartment's kitchen. A.B. later told a police officer that she entered Nelson's kitchen in order to find a weapon. Nelson asked A.B. to leave his apartment.

Earlier on December 7, 2011, the male teenager M.C. visited Melinda Barrera and David McLaughlin's apartment. M.C. then went to Robert Nelson's apartment to visit Michael Dennis and because Barrera and McLaughlin asked for privacy. When M.C. entered Nelson's apartment, Nelson was yelling at A.B. A.B. told M.C. to run and get McLaughlin from the apartment next door.

David McLaughlin and Melinda Barrera, from their next door apartment, heard Nelson yelling with A.B. Barrera went to Nelson's apartment and entered the apartment's back door. According to A.B., Barrera was empty handed. According to

3

M.C., Barrera entered with a silver gun. Melinda Barrera testified she entered the apartment with a hammer.

Upon entering the apartment, Barrera demanded Nelson to stop yelling at A.B. and to move from A.B.'s person. M.C. observed Barrera point the gun at Nelson and demanded he shut up or she would shoot him. David McLaughlin promptly also entered Nelson's apartment and, with a baseball bat, clubbed Nelson, who was by then inside his bedroom but with the bedroom door partially open.

Yelling and shoving ensued between Robert Nelson, on the one hand, and Melinda Barrera and David McLaughlin, on the other hand. A.B. retreated to a back room in Nelson's apartment. Nelson moved further into his apartment bedroom, while Barrera stood in the bedroom doorway. Nelson continued to yell and Barrera told him she was calling for help. Nelson grabbed a phone from his bedroom and struck Barrera in the head with it several times. In turn, according to Barrera, she hit Nelson in his face with the hammer. M.C. saw Nelson strike Barrera in the head with a phone and saw Barrera strike Nelson in the face with a gun, not a hammer.

Robert Nelson flipped a table, threw items, and, according to witnesses, slammed his bedroom door shut. Melinda Barrera testified Nelson continued to yell and threw screws and nails at her. Barrera fell. According to Barrera, before the bedroom door closed, she saw a gun on a chair, grabbed it, and loaded a bullet into it. Barrera again told Nelson to calm down. Barrera testified she, rather than Nelson, pulled the bedroom

4

door closed. As Barrera turned away from Nelson's bedroom door, the gun fired. She thought the gun fired in the direction of a closet, not Nelson's bedroom.

Immediately after the bedroom door shut, Misty Warden, A.B., and M.C. heard a gun fired, while Melinda Barrera and David McLaughlin stood outside the door. M.C. saw McLaughlin take the gun from Barrera immediately before he heard the gun fire. Warden did not see the shot fired, but saw McLaughlin with a gun. No one was aware of the bullet striking anyone. Melinda Barrera, David McLaughlin and A.B. exited Nelson's apartment. A.B. then saw McLaughlin with a gun in hand.

While alone in his bedroom with the door shut, Robert Nelson called 911. Police arrived at Nelson's apartment and were met by Misty Warden and Michael Dennis. Neither Warden nor Dennis realized Nelson was injured. An officer kicked open Nelson's bedroom door to find him, phone in hand, lying on his bed dead. The medical examiner concluded that Nelson suffered blunt force trauma to his left cheek, left arm, left hand, and chest, but the cause of death was a gunshot wound to the chest and abdomen.

Melinda Barrera initially told police she worked that evening and was not present in Nelson's apartment. As police began to question David McLaughlin, Barrera confessed to shooting Nelson. Barrera told police she hid the gun under a floorboard in a neighbor's apartment. Police removed that floorboard and found a gun and a plastic

5

baggie with eight .22 caliber bullets. In Nelson's apartment, police found a hammer and a baseball bat.

## PROCEDURE

The State charged Melinda Barrera and David McLaughlin with second degree murder, under RCW 9A.32.050(1), for the death of Robert Nelson. Second degree murder may be proved by one of two alternate means. The State charged both Barrera and McLaughlin, under subsection (a) of the statute, with intentionally causing Nelson's death and, in the alternative, under subsection (b) of the statute, with causing Nelson's death in furtherance of a felony, or in immediate flight from the felony. Subsection (a) is intentional, nonpremeditated murder. Subsection (b) constitutes felony murder. The alleged felony committed by Barrera and McLaughlin was second degree assault. Barrera and McLaughlin were tried together and the State alleged, in the alternative, that each defendant was an accomplice of the other defendant.

The State charged intentional murder and felony murder as separate counts, despite each being the crime of second degree murder. Thus, the trial court gave separate jury instructions for the two alternate means of second degree murder and the jury was respectively required to find each means proved beyond a reasonable doubt to reach a guilty verdict on that count. No one proposed, and the trial court did not give, a jury instruction directing the jury that, if it finds one of the defendants guilty of felony murder, it must decide unanimously which of many acts performed by the guilty

6

defendant or the accomplice constituted assault. In other words, the jury need not have

decided unanimously which assaultive act caused the death of Robert Nelson.

The jury acquitted David McLaughlin of all charges and found Barrera not guilty

of intentional second degree murder under subsection (a) of RCW 9A.32.050(1). The

jury found Barrera guilty, however, of second degree murder under subsection (b) of the

statute, for assaulting Nelson and causing his death.

Since the State sought sentence enhancements for use of a deadly weapon and use

of a firearm, the trial court gave two jury instructions addressing the enhancements. Jury

instruction 37 read, in relevant part:

> For purposes of a special verdict the State must prove beyond a
> reasonable doubt that the defendant was armed with a deadly weapon at the
> time of the commission of the crime.
>      . . . .
> A deadly weapon is an implement or instrument that has the capacity
> to inflict death and from the manner in which it is used, is likely to produce
> or may easily and readily produce death. The following instruments are
> examples of deadly weapons: blackjack, sling shot, billy, sand club,
> sandbag, metal knuckles, any dirk, *dagger, pistol, revolver or any other
> firearm*, any knife having a blade longer than three inches, any razor with
> an unguarded blade, and any metal pipe or bar used or intended to be used
> as a club, any explosive, and any weapon containing poisonous or injurious
> gas.

Clerk's Papers (CP) at 110 (emphasis added). Jury instruction 38 read, in relevant part:

> For purposes of a special verdict, the State must prove beyond a
> reasonable doubt that the defendant was armed with a *firearm* at the time of
> the commission of the crime.
>      . . . .

7

A "firearm" is a weapon or device from which a projectile may be fired by an explosive such as gunpowder.

CP at 111 (emphasis added). Jury instruction 31 expressly stated, "A firearm, whether loaded or unloaded, is a deadly weapon." CP at 103.

The trial court gave two special verdict forms asking the jury to answer further questions if Melinda Barrera was found guilty of second degree murder. The first verdict form asked if Barrera was armed with a deadly weapon when she committed the murder. The second asked if she was armed with a firearm when she committed the murder. The jury answered yes to both questions. The jury was not asked to identify the deadly weapon with which Barrera was armed.

The trial court sentenced Barrera to 224 months' confinement, including consecutive sentence enhancements of 60 months for using a firearm and 24 months for using a deadly weapon.

## LAW AND ANALYSIS

### Waiver of Argument

The State asks us to ignore Melinda Barrera's argument that the court failed to deliver an unanimity jury instruction, because Barrera did not propose such an instruction below. Such an unanimity instruction is known as a *Petrich* instruction because of a rule announced in *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984). The State contends that a criminal appellant may not assign error to the failure to give a jury instruction

never requested unless the appellant contends the failure was "manifest error." In her opening brief, Barrera argues manifest error.

Under RAP 2.5(a), an appellate court may decline to hear assignments of error not raised before the trial court. One exception to this declination rule is a party's assertion of "manifest error affecting a constitutional right." RAP 2.5(a)(3). Under this exception, an appellant must demonstrate (1) the error is manifest and (2) the error is truly of constitutional dimension. *State v. O'Hara*, 167 Wn.2d 91, 98, 101, 217 P.3d 756 (2009).

Melinda Barrera assigns a constitutional error. Of course, we cannot determine if the trial court committed manifest error without first reviewing the substance of the claimed error. For this reason, our state high court agreed to hear an appellant's argument for the first time on appeal for the need for an unanimity instruction. *State v. Bobenhouse*, 166 Wn.2d 881, 892, 214 P.3d 907 (2009). Our court has often ruled that, because the test for determining whether an alleged error is "manifest" is closely related to the test for the substantive issue of whether an unanimity instruction was required, we conflate the two analyses. *State v. Knutz*, 161 Wn. App. 395, 407, 253 P.3d 437 (2011); *State v. Love*, 80 Wn. App. 357, 908 P.2d 395 (1996); *State v. Fiallo-Lopez*, 78 Wn. App. 717, 899 P.2d 1294 (1995). We thus agree to hear Melinda Barrera's assignment of error, although this victory is pyrrhic in nature.

### Unanimity Jury Instruction

Melinda Barrera and her codefendant were charged with second degree murder.

The controlling statute is RCW 9A.32.050, which reads in pertinent part:

(1) A person is guilty of murder in the second degree when:
    (a) With intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person; or
    (b) He or she commits or attempts to commit any felony, including assault, other than those enumerated in RCW 9A.32.030(1)(c), and, in the course of and in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

The appeal concerns only subsection (b) of the statute. Barrera complains that many of her acts could constitute the predicate assault to form the basis for her felony murder conviction but the jury was not instructed to find that the State must prove beyond a reasonable doubt the discrete act she committed that sustained the conviction. Barrera accurately notes that the jury could have found (1) Barrera came to the apartment unarmed, (2) Barrera came to the apartment with a gun but did not use it, (3) Barrera came to the apartment with a hammer and struck Nelson with it, (4) Barrera came to the apartment armed with a gun and struck Nelson with that, (4) Barrera grabbed Nelson's gun and struck him with it, or (5) Barrera deliberately shot Nelson through the door but did not intend to kill him.

Many broad principles tangentially substantiate Melinda Barrera's argument that the jury should have been instructed it must unanimously agree as to which act was felonious and caused death. The United States Constitution Fourteenth Amendment due process clause entitles a criminal defendant to a jury determination that she is guilty of

10

every element of the crime with which she is charged, beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The due process clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *Apprendi*, 530 U.S. at 477. In compliance with these principles, Washington courts recognize that, to convict a person of a criminal charge, the jury must be unanimous that the defendant committed the criminal act. *State v. Camarillo*, 115 Wn.2d 60, 63, 794 P.2d 850 (1990); *Bobenhouse*, 166 Wn.2d at 892.

The standard for whether the failure to provide a unanimity instruction was error hinges on whether we address an *alternative means* case or a *multiple acts* case. *Bobenhouse*, 166 Wn.2d at 892. When the legislature intended to define but one crime that could be committed in different ways, we deal with a multiple acts case. *Id.* In contrast, "alternative means" cases occur when the legislature enacted separate and distinct offenses that when committed constitute another crime. *Id.* We need not determine whether intentional second degree murder is a distinct crime from felony second degree murder, since Barrera does not assign error on this ground and the Supreme Court previously decided that second degree murder is only one crime regardless of which subsection of the statute is charged. *State v. Cadena*, 74 Wn.2d 185, 443 P.2d 826 (1968). Barrera complains that the jury heard evidence of many assaultive acts committed by her, but the jury did not need to specify which act constituted the

11

predicate felony for purposes of murder. Thus, this is a multiple acts case.

In "multiple acts" cases, the jury must unanimously agree as to which incident constituted the crime charged. *Bobenhouse*, 166 Wn.2d at 893. Where multiple acts relate to one charge, the State must elect the act on which it relies to convict the defendant, or the trial court must provide a unanimity instruction—a *Petrich* instruction. *Petrich*, 101 Wn.2d at 572. The failure to do so in multiple acts cases is constitutional error. *Bobenhouse*, 166 Wn.2d at 893. The error stems from the possibility that some jurors may have relied on one act or incident and some jurors a different act, resulting in a lack of unanimity on all of the elements necessary for a valid conviction. *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988). Under such circumstances, the State must elect the specific criminal act on which it is relying for conviction, or the trial court must instruct the jury that all the jurors must agree that the same underlying criminal act was proven beyond a reasonable doubt. *Kitchen*, 110 Wn.2d at 411.

An exception, which applies here, dilutes the multiple acts rule. The State need not make an election and the trial court need not give a unanimity instruction if the evidence shows the defendant was engaged in a "continuing course of conduct." *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989); *Fiallo-Lopez*, 78 Wn. App. at 724. We review the facts in a commonsense manner to decide whether criminal conduct constitutes one continuing act. *Handran*, 113 Wn.2d at 17. Courts have considered various factors in determining whether a continuing course of conduct exists in a

particular case. Generally, evidence that the charged conduct occurred at different times and places tends to show that several distinct acts occurred rather than a continuing course of conduct. *Handran*, 113 Wn.2d at 17. Evidence of a single victim likewise is not enough in itself to demonstrate that the offense was one continuing offense. *Petrich*, 101 Wn.2d at 571. In contrast, evidence that a defendant engages in a series of actions intended to secure the same objective supports the characterization of those actions as a continuing course of conduct rather than several distinct acts. *Handran*, 113 Wn.2d at 17.

Several cases illustrate the application of the continuing conduct exception. In *Handran*, 113 Wn.2d 11, two alleged assaults did not require a unanimity instruction because the defendant's actions showed a continuing course of conduct intended to secure sexual relations with the victim rather than several distinct acts. Near midnight, Daniel Handran climbed in the window to his ex-wife Jill's apartment. Jill awoke to find Handran leaning over her, nude and kissing her. She demanded that he leave immediately. Instead, he pinned her, hit her in the face, and offered her money. Handran was charged with burglary in the first degree, which required proof of entering or remaining in the apartment with intent to commit a crime against a person therein. Handran argued that the trial court erred in failing to instruct the jury that it must be unanimous as to which act alleged constituted the crime he intended to commit inside the apartment. He contended that the jury could have found an assault in his kissing Jill or in

13

his hitting her, but that the jury should have been instructed to reach a unanimous decision that one or the other of those acts constituted the underlying assault. This argument failed, however, because the two acts of assault were part of a continuing course of conduct. Handran's criminal conduct occurred in one place during a short period of time between the same aggressor and victim.

Another controlling decision is *Fiallo-Lopez*, 78 Wn. App. 717. Fiallo-Lopez sought an unanimity instruction on the charge of delivery of cocaine. The evidence showed two discrete acts of delivering cocaine, a sample at a restaurant and baggies of cocaine at Safeway. The court disagreed that an instruction was needed since the two deliveries of cocaine were a continuing course of conduct. The purchaser of each sale was the same and the purchases were near in time.

Comparing the eponymous decision, *Petrich*, 101 Wn.2d 566, to *Fiallo-Lopez* and *Handran* helps explain the continuing conduct exception. The State charged Petrich with one count of indecent liberties and one count of second degree statutory rape. The victim, Petrich's granddaughter, testified to at least 4 episodes of sexual contact during a 22-month period of time. The court held that the trial court committed error by not giving a jury instruction demanding that the jury find beyond a reasonable doubt the specific acts or incidents upon which a conviction was based. Each incident occurred in a separate time frame and identifying place. The only connection between the incidents was the victim.

14

Barrera's conduct throughout the incident resulting in Nelson's death constitutes one continuing course of conduct. No matter the nature of the assault, be it striking Nelson with a gun, hammer, or both, or if Barrera only shot without intent to kill, all the actions were immediate in time, close in space, and directed at the same victim as part of a single argument. These actions were all part of the same event. The trial court did not err by withholding a *Petrich* instruction on unanimity.

## Deadly Weapon Enhancement

The State pled deadly weapon and firearm enhancements to increase any sentencing of Melinda Barrera. The jury found that both enhancements applied and those findings impacted Melinda Barrera's sentence. A conundrum arises with the findings in that a jury instruction defined a deadly weapon as including a firearm. Thus, the jury could have based each enhancement on the same weapon, the silver gun.

RCW 9.94A.533(4) authorizes courts to impose an additional 24 months' confinement "if the offender or an accomplice was armed with a deadly weapon other than a firearm as defined in RCW 9.41.010." RCW 9.41.010(9), in turn, defines "firearm" as "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder." Thus a second problem arises in that a jury instruction wrongfully included, rather than excluded, a firearm as a deadly weapon.

Melinda Barrera argues that the jury's finding that she used a deadly weapon does not support the finding that Barrera used a "deadly weapon other than a firearm."

15

Without such a finding, the trial court cannot impose a deadly weapon sentence enhancement under RCW 9.94A.533(4), which excludes firearms. We agree.

The State argues that the medical examiner testified that Nelson suffered blunt force traumas to his head and body. This blunt force trauma corresponds with Barrera's confession that she struck Nelson in the face with a hammer and then shot him with a firearm. Thus, the State contends, assuming that the jury followed the court's instructions, the jury properly found that Barrera used both a deadly weapon and a firearm. Contrary to the argument, if the jury followed the court's instructions, it had to answer yes for each enhancement even if the deadly weapon was a gun. This court presumes the jury followed these instructions. *State v. Johnson*, 124 Wn.2d 57, 77, 873 P.2d 514 (1994).

When a trial court imposes an enhanced sentence not supported by facts found by the jury with its special verdict, the resulting error can never be harmless. *State v. Reyes-Brooks*, 165 Wn. App. 193, 202, 267 P.3d 465 (2011). Thus, we hold the trial court committed error to the detriment of Melinda Barrera.

Firearm Enhancement

Melinda Barrera seeks to vacate the firearm enhancement because of the inconsistency and unfairness of an enhancement for use of a firearm as a firearm and a deadly weapon. Because we rule that the trial court exceeded the authority afforded by the jury's special verdict findings when it imposed a deadly weapon sentence

16

No. 31053-1-III
*State v. Barrera*

enhancement, we will not address this companion assignment of error.

CONCLUSION

We affirm Melinda Barrera's conviction for second degree murder. We hold the trial court erred when it instructed the jury that a "deadly weapon" includes a "firearm," and then imposed both deadly weapon and firearm sentence enhancements. We remand for resentencing, during which the trial court may impose an enhancement for a firearm, but not a deadly weapon.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____          _____
Brown, J.                                 Siddoway, C.J.

17