IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32053-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT L. HUTSELL, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Robert Hutsell appeals his convictions of first degree child

rape and first degree child molestation, contending that the evidence suggested several

acts of rape or molestation against eight-year-old E.L., yet the State did not elect a single

act as the basis for each charge nor was the jury given a *Petrich*[1] instruction. He claims

that his Sixth Amendment right to a unanimous jury verdict was violated as a result. In a

pro se statement of additional grounds, Mr. Hutsell assigns four errors.

As described by the witnesses, the several criminal acts supported by the evidence

were all part of a continuous course of conduct, with the result that no election or *Petrich*

instruction was required. For that reason, and because Mr. Hutsell raises no viable

challenge in his statement of additional grounds, we affirm.

---

[1] *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), *overruled in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988).

## FACTS AND PROCEDURAL BACKGROUND

In February 2011, Robert Hutsell offered to babysit the four children of a couple with whom he was friends, so that the couple could enjoy a night out. It was agreed that Mr. Hutsell would pick up the children from their home, take them to his home to spend the night, and return them the following day. During the evening of the overnight, the two older children—both boys—played video games in Mr. Hutsell's living room. The two girls, eight-year-old E.L. and her younger sister, were in Mr. Hutsell's bedroom, where E.L. played a computer game on Mr. Hutsell's bed while her sister and Mr. Hutsell watched.

E.L. was originally playing the game cross-legged, but eventually rolled onto her stomach to play, after which Mr. Hutsell, who was sitting beside her, began to rub her back. When E.L.'s sister, M.L., fell asleep, Mr. Hutsell moved M.L. to the top of the bed, returned to E.L.'s side and continued rubbing her back. Then, as later recounted by E.L., Mr. Hutsell "started moving closer down" to her "bottom." Report of Proceedings (RP) at 117. After about 10 minutes, he removed her pajama pants and then her underwear, rolled her over, and sexually assaulted her. Evidence was later presented at trial that he licked her in her "front" "private area" at a minimum, RP at 323; E.L. also told a forensic interviewer that Mr. Hutsell had also put his tongue inside her vagina, touched her vagina with his fingers, and put his penis inside her "butt." Ex. 3, at 22 (transcript of forensic interview (Apr. 4, 2011)).

2

The molestation ended when E.L. told Mr. Hutsell that she had to go to the bathroom. She picked up her clothes, took them into the bathroom with her, got dressed, and then went into the living room with her brothers, where she stayed for the rest of the night.

E.L. told her brother, D.L., that Mr. Hutsell had licked her private parts, but neither of them initially mentioned anything about the incident to their parents upon being returned home by Mr. Hutsell. According to E.L., she was "scared" that "it was going to be [her] fault." RP at 122.

Weeks later, E.L.'s father was speaking on the telephone with Mr. Hutsell, when D.L.—hearing the conversation—mentioned to his mother that E.L. had accused Mr. Hutsell of something. When asked by her mother what had happened, E.L. disclosed that Mr. Hutsell had "licked her and touched her in her private area." RP at 397. E.L.'s mother immediately told E.L.'s father to get off the phone and, when he did, she called the police. Mr. Hutsell called E.L.'s father back shortly thereafter to continue their conversation and ask about what had disrupted their call, and learned of E.L.'s accusations.

The police investigation included an interview of E.L. by Karen Winston, a forensic child interviewer. Ms. Winston used a body diagram during the questioning to facilitate a description of what had happened. E.L. told Ms. Winston that Mr. Hutsell "kept putting his tongue inside [her] vagina." Ex. 3, at 20. E.L. also told Ms. Winston

3

that Mr. Hutsell had touched her with his finger and "his private part." *Id.* at 21. Upon

further questioning, E.L. reportedly told Ms. Winston that Mr. Hutsell's finger had gone

to "the same place" as his tongue; Ms. Winston maintains that E.L. further confirmed this

by pointing to the "crotch area on the body diagram." *Id.* at 22; RP at 165. When

questioned about where Mr. Hutsell's "private part" touched her, Ms. Winston says that

E.L. pointed to the buttocks on the female body diagram and the penis on the male body

diagram. RP at 166. E.L. explained Mr. Hutsell "made [her] stick out [her] butt." Ex. 3,

at 25.

Unbeknownst to E.L.'s parents, Mr. Hutsell had two prior sex offenses—one for

statutory rape and another for rape of a child in the first degree—and he had violated his

probation by being alone with E.L. and her siblings. After learning from E.L.'s father of

E.L.'s allegations, Mr. Hutsell called his department of corrections supervising officer

and reported that he had babysat children without a chaperone, in violation of his

probation. He was arrested for the violation, after which Detective Paul Lebsock

interviewed him at the Benton County Jail. According to Detective Lebsock, Mr. Hutsell

admitted to having removed E.L's pajama pants and underwear and having licked her

vagina, but denied any other touching with his tongue, finger, or penis.

The State charged Mr. Hutsell with one count each of child rape in the first degree

and child molestation in the first degree.

4

At trial, E.L. testified that Mr. Hutsell licked her "in [her] private area." RP at 323. When asked to clarify, she explained it was her "front area" that was licked. *Id.* E.L.'s brother testified that E.L. told him that Mr. Hutsell "licked her private." RP at 346. E.L.'s mother testified that E.L. disclosed to her that Mr. Hutsell "licked her and touched her in her private area" about a month after it happened. RP at 397. Detective Lebsock testified to his jailhouse interview of Mr. Hutsell. Ms. Winston testified to the substance of her interview with E.L., and a videotape of the interview was played for the jury.

In the defense case, investigators engaged by Mr. Hutsell testified that during their interview of E.L., she did not allege any sexual contact other than being licked on her vagina. A report of a medical examination of E.L. undertaken in connection with the investigation stated, "[h]ymenal tissue intact. No obvious transections or scars. Anus without dilation or scars. Skin and extremities within normal limits." RP at 555. Finally, Mr. Hutsell testified on his own behalf and denied having made any admission to Detective Lebsock and denied any sexual contact with E.L.

The jury found Mr. Hutsell guilty of both counts. In light of his two prior offenses, he was sentenced to life in prison without parole. He appeals.

## ANALYSIS

Mr. Hutsell contends that because the State presented evidence of several sexual acts that could constitute the charged crimes but did not elect which acts it was relying

5

on, nor did the Court provide the jury with a *Petrich* instruction, he was denied his Sixth Amendment right to a unanimous jury verdict. In response, the State argues that each of the acts described was part of a continuing course of conduct.

"In Washington, a defendant may be convicted only when a unanimous jury concludes that the criminal act charged in the information has been committed." *Petrich*, 101 Wn.2d at 569. "When the evidence indicates that several distinct criminal acts have been committed, but defendant is charged with only one count of criminal conduct, jury unanimity must be protected." *Id.* at 572. To adequately protect jury unanimity, either the State must elect the specific act it is relying on to constitute the crime charged or the court must give the jury a "*Petrich*" instruction, telling them that all "12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt." *Id.* "[F]ailure to follow one of these options is error, violative of a defendant's state constitutional right to a unanimous jury verdict and United States constitutional right to a jury trial." *Kitchen*, 110 Wn. 2d 403, 409, 756 P.2d 105 (1988), *abrogated in part on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014).

If jury unanimity is not assured through election or instruction, the result can be sustained on the basis that the error was harmless only if the constitutional harmless error standard is satisfied. "[T]he error will be deemed harmless only if no rational trier of fact

could have entertained a reasonable doubt that each incident established the crime beyond a reasonable doubt." *Kitchen*, 110 Wn. 2d at 406.

The requirement for either an election or a *Petrich* instruction applies only when the State presents evidence of several distinct criminal acts. *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989). "It does not apply where the evidence indicates a 'continuing course of conduct.'" *Id.* (quoting *Petrich*, 101 Wn.2d at 571). The State contends in this case that Mr. Hutsell's sexual acts constituted a continuing course of conduct.

Generally, evidence that the charged conduct occurred at different times and places tends to show that several distinct acts occurred rather than a continuing course of conduct, whereas evidence that a defendant engaged in a series of actions intended to secure the same objective supports the characterization of those actions as a continuing course of conduct rather than as distinct acts. *State v. Fiallo-Lopez*, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995) (citing *Handran*, 113 Wn.2d at 17). In determining whether an act is one of several distinct criminal acts or part of a continuing course of conduct "'the facts must be evaluated in a commonsense manner.'" *Handran*, 113 Wn.2d at 17 (quoting *Petrich*, 101 Wn.2d at 571).

Here, the constitutional harmless error standard would not be satisfied, because E.L.'s allegations as reported to others, reflected in the videotaped interview, and described in her trial testimony, were somewhat imprecise (despite the State's efforts to

7

obtain specifics) and were not entirely consistent. As Mr. Hutsell argues, the evidence,

while sufficient to sustain the jury's verdict, fell short of that required to say that every

rational juror would have found every act alleged beyond a reasonable doubt.

We agree with the State, however, that it charged and prosecuted the counts as

involving a continuing course of conduct and that its evidence supported that approach,

with the result that no election or *Petrich* instruction was required. At trial, E.L.

described all of the conduct as occurring in Mr. Hutsell's bedroom, beginning after M.L.

fell asleep and was moved by Mr. Hutsell to the top of the bed:

> Q   Did the rubbing of the back ever stop?
> A   Yes, eventually.
> Q   What happened after that?
> A   He pulled off my pants.
> Q   Okay. Now, you said you were sitting criss-cross applesauce. Were you still sitting criss-cross applesauce?
> A   I was laying on my belly.
> Q   Do you remember what you were wearing?
> A   My pajamas.
> Q   And do you remember what kind of pajamas?
> A   Hannah Montana.
> Q   And sometimes pajamas can be like a long gown or it could be like a bottom pants and top. Do you remember which kind?
> A   Bottom pants and top.
> Q   And so you said your pants were pulled down and you were on your—
> A   Belly.

RP at 117. She testified that after pulling off her pajama pants, Mr. Hutsell pulled off her

underwear. RP at 118. She then described the sexual contact and how it ended:

> Q   What happened next?
> A   That's when he started licking me.

8

Q   Okay. Did you get licked on parts of your body?
A   Yes.
Q   What part?
A   My private area.
Q   Lots of people say "private area" for lots of different areas. Was it a specific private area? What was the specific private area?
A   My bottom private area.
Q   And you were on your stomach?
A   My back.
Q   On your back. And about how long did that occur?
A   I don't remember.
Q   Did it end?
A   Yes.
Q   What happened when it ended?
A   I told him I had to go to the bathroom.
Q   What did you do?
A   I took my clothes and went to the bathroom, put them back on, and went out into the living[ r]oom.

RP at 119-20.

E.L., 11 years old by the time of trial, could not place a time frame on the conduct, but closer questioning revealed that it was uninterrupted and that it occurred during a time frame after her younger sister fell asleep and while her older brothers were still up and playing video games:

Q   When you got up from the bed, were you able to find your clothes?
A   Yes.
Q   Did you leave and put them on or did you put them on and leave?
A   I grabbed them and left.
Q   Did you go right to the bathroom?
A   Yes.
Q   How far away was the bathroom?
A   I think it was right across the hall.
. . . .
Q   Where did you go next?

9

A   Then I went out into the living[ r]oom.
Q   Who was out in the living[ r]oom?
A   My brothers.
Q   Were they asleep or still playing video games?
A   They were still playing video games.
Q   What did do you [sic] out there?
A   I went to the couch.
Q   Did you watch for a while?
A   Yes.
Q   Did you ever play the video game out in the living room again?
A   No.
Q   Did everybody go to sleep at some point?
A   Yes.
Q   How did that happen?
A   I fell asleep first and then my brothers fell asleep.
Q   And did you sleep through the night or ever get up to go to the bathroom?
A   I slept through the night.

RP at 120-21.

All of the acts happened on a single night, in Mr. Hutsell's bedroom, and according to E.L.'s recount were uninterrupted until they ended when she told Mr. Hutsell she needed to go to the bathroom and moved into the living room and the safety of her brothers' company. It is reasonable to infer from surrounding events that the acts occurred over a short period of time. All of Mr. Hutsell's actions were of a type to secure the same objective: sexual gratification.

While one could parse E.L.'s original description of events to Ms. Winston into multiple acts that would separately support a guilty verdict for rape of a child in the first

degree,[2] and first degree child molestation,[3] a commonsense analysis supports the State's

characterization and prosecution of the criminal conduct as a continuous course of action.

As a result, although the State did not elect which act it was relying on to support the

charges against Mr. Hutsell, the court was not required to give the jury a *Petrich*

unanimity instruction. The trial court did not err.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds for review (SAG), Mr. Hutsell raises

four.

*1. Failure to follow "protocol" during jailhouse interview.* Mr. Hutsell argues

that Detective Lebsock did not "follow protocol" because he neither videotaped his

---

[2] The child rape charge required the State to prove that Mr. Hutsell had sexual intercourse with E.L. RCW 9A.44.010(1) provides that "sexual intercourse":

    (a) has its ordinary meaning and occurs upon any penetration, however slight, and
        (b) Also means any penetration of the vagina or anus however slight, by an object, when committed on one person by another, whether such persons are of the same or opposite sex, except when such penetration is accomplished for medically recognized treatment or diagnostic purposes, and
        (c) Also means any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another whether such persons are of the same or opposite sex.

[3] The child molestation charge required proof of "sexual contact." "Sexual contact means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desires of either party." RCW 9A.44.010(2).

11

interview of Mr. Hutsell nor did he have Mr. Hutsell write out a statement, and either means was feasible at the jail. SAG at 2. Mr. Hutsell had the opportunity to cross-examine Detective Lebsock about the fact that he did not avail himself of these other means of procuring a statement from Mr. Hutsell and argue this shortcoming to the jury.

Even if not the best record of a confession, statements by a criminal defendant are admissible at his trial as admissions of a party under ER 801(d)(2)(i). It is for the fact finder to determine the credibility of witnesses and the persuasiveness of evidence. *In re Kuvara*, 97 Wn.2d 743, 747, 649 P.2d 834 (1982). The court did not err in admitting the detective's testimony to the confession.

*2. & 3. Ineffective assistance of counsel: failure to obtain a child interviewer and failure to impeach witnesses.* Mr. Hutsell next complains that his trial lawyer failed to hire a child interviewer for the defense and that he failed to impeach witnesses. A well settled standard applies to claims of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must show both that his counsel erred and that the error was so significant, in light of the entire trial record, that it deprived him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 690-92, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). When a claim can be disposed of on one ground, a reviewing court need not consider both *Strickland* prongs. *Id.* at 697; *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726, *review denied*, 162 Wn.2d 1007 (2007).

To demonstrate that he was prejudiced by his lawyer's failure to call a child interviewer for the defense, Mr. Hutsell must show, at a minimum, that a supportive witness existed. Nothing in the record indicates that one did. If Mr. Hutsell has evidence of the availability of such a witness, his remedy is to file a personal restraint petition supported by that evidence from outside our record. "Typically, where the record does not support an argument or there is evidence outside of the record, the remedy is to bring a personal restraint petition with evidence in support of the claim." *State v. Turner*, 167 Wn. App. 871, 881, 275 P.3d 356 (2012).

Mr. Hutsell challenges his lawyer's failure to impeach witnesses but without saying which witnesses, or how they could have been impeached. Although Mr. Hutsell is not required to cite to the record in a SAG, he must inform the court of the nature and occurrence of alleged errors. RAP 10.10(c). Here, too, if there is nothing in the record to demonstrate that a witness could have been impeached, then Mr. Hutsell will have to pursue this claim, if at all, through a personal restraint petition demonstrating prejudice.

*4. Failure to sequester the jury.* Mr. Hutsell complains that the jury was allowed to return home each night following trial, creating a risk of media exposure despite the fact that he faced the prospect of life in confinement without the possibility of parole. We find nothing in searching the record that indicates that sequestration was ever requested or, for that matter, that there was concern about media interest in Mr. Hutsell's case. We will not consider arguments made for the first time on appeal. RAP 2.5(a).

13

*State v. Hutsell*
No. 32053-7-III

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Siddoway, C.J.

WE CONCUR:

Brown, J.

Lawrence-Berrey, J.