[No. 30837-8-I.   Division One.   July 31, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSE FIALLO-LOPEZ, *Appellant*.

---

[12]Br. of Appellant, at 15.

*Patricia Novotny,* of *Washington Appellate Defender Association,* for appellant.

*Rian Ebesugawa, Deputy Prosecuting Attorney,* for respondent.

Cox, J. — An undercover buy operation for drugs— starting at a restaurant and ending a short time later in a supermarket parking lot--netted nine ounces of cocaine,

buy money, and several participants in the transaction. We must decide whether (a) a unanimity instruction to the jury was required at the trial of Jose Fiallo-Lopez and (b) certain comments of the prosecutor at that trial constituted misconduct requiring reversal of the conviction. Holding that (a) no unanimity instruction was required because the activities of Fiallo-Lopez constituted a continuing course of conduct and (b) the comments of the prosecutor either were not misconduct or did not affect the jury's decision, we affirm.

The undercover operation involved Fiallo-Lopez, two undercover detectives, Jeff Cooper (a police informant), and Pedro Lima (the man from whom Cooper was to purchase nine ounces of cocaine at a restaurant named Las Margaritas). The deal was ultimately completed at a Safeway parking lot. Because the testimony of the participants in the operation conflicts, we set forth the key testimony relevant to our analysis.

### THE RESTAURANT

*Cooper's testimony.* Cooper, the informant, testified that he had purchased a small amount of cocaine from Lima at Las Margaritas a day or so before the April 12, 1991 purchase at issue in this case. On April 12, Cooper and two undercover detectives entered Las Margaritas. Lima spoke to Fiallo-Lopez while Cooper and the detectives waited in the lounge. Cooper asked Lima for a sample of the nine ounces he would be purchasing. Lima left Cooper's range of vision and returned with a sample of cocaine. Cooper did not go outside with Lima to get the sample, and he did not test the sample as he had during the previous purchase.

On receiving the sample, Cooper went outside with Lima and gave it to one of the undercover detectives waiting in a car. Lima had the keys to Fiallo-Lopez's Chevy Blazer, which was parked outside the restaurant. He instructed Cooper to take the nine ounces of cocaine out of the Blazer and put the money for the deal into the vehicle.

Before Cooper could do what Lima said, Lima's wife drove into the parking lot and stopped the negotiations because she was worried about undercover officers being nearby. Cooper heard the Limas arguing about whether to give him the keys to the Blazer. Cooper accompanied Lima inside the restaurant and saw him return the keys to the Blazer to Fiallo-Lopez. Lima then told Cooper to go to the Safeway on Aurora.

*Lima's testimony.* Lima testified that after his arrest on April 12, 1991, he agreed to work for the police in exchange for not being charged for his participation in the events at Las Margaritas and Safeway. According to Lima, Fiallo-Lopez gave him the keys to the Blazer and told him to get the cocaine from there. Cooper accompanied Lima outside and was with Lima when he took a sample of cocaine out of the bag in the Blazer. They went to the men's room, and Cooper tried the cocaine. Lima recalled that after Cooper tried the sample, Lima returned it to the Blazer and gave the keys back to Fiallo-Lopez. He was sure he was not confusing the facts of April 12 with those of Cooper's previous buy.

*Detective Tucker's testimony.* Detective Tucker was one of several surveillance officers in the undercover operation. Tucker saw Fiallo-Lopez arrive at the restaurant in a Chevy Blazer. Fiallo-Lopez entered the restaurant and came out later with Lima. They talked beside the Blazer, but Tucker did not see them open the Blazer doors or exchange anything before they reentered the restaurant.

Thereafter, Detective Tucker saw Cooper and the two undercover detectives arrive in an undercover car and enter the restaurant. Fiallo-Lopez later left the restaurant, got into his Chevy Blazer, and drove north on Aurora. Cooper and the detectives followed Fiallo-Lopez.

*Detective Broggi's testimony.* Detective Broggi was one of the two undercover detectives working with Cooper. When Cooper gave her the sample of cocaine while she sat in the car outside the restaurant, he told her Lima wanted them to put the money on the floorboard of the Blazer and

take the cocaine from the Blazer. Cooper told Broggi that Lima was going to get the keys to the Blazer from Fiallo-Lopez. Shortly thereafter, Fiallo-Lopez left the restaurant and drove off. Cooper returned to Broggi's car and said the deal had been moved to the Safeway parking lot.

### THE SAFEWAY PARKING LOT

*Cooper's testimony.* When Cooper and the two detectives arrived at Safeway, they saw Fiallo-Lopez in the Blazer and parked a few spaces away from him. As Cooper walked over to him, Fiallo-Lopez drove out of the parking lot. Cooper later saw Lima's convertible and Fiallo-Lopez's Blazer across the street at a gas station. Lima drove his car into the Safeway lot, and Cooper got into the passenger seat. Cooper testified that he had not seen the cocaine then, but he had assumed Lima had it because Lima motioned for Broggi to bring the money over, and he began putting up the convertible top. Lima was also very anxious, which Cooper recognized as a sign that Lima had the cocaine with him.

As Broggi approached the convertible with the money, Lima parked and the Blazer pulled up beside him. Lima then threw a black case into Cooper's lap. Cooper assumed Lima had gotten the cocaine from the convertible's glove box or from under the seat, but he testified that he could not remember seeing where Lima actually obtained the cocaine. He also explained that he had not always been able to see the Blazer or the convertible during the entire transaction. Cooper opened the black case and saw a blue bag inside which contained individually wrapped baggies of what appeared to be cocaine. Cooper then pressed an arrest alert device. Subsequent lab tests showed that both the sample Cooper received at the restaurant and one of the one-ounce baggies taken from the blue bag contained cocaine.

*Lima's testimony.* Cooper got into Lima's convertible at Safeway, and Fiallo-Lopez parked the Blazer beside the convertible as Lima was trying to put up the top. Fiallo-

Lopez threw the bag of cocaine into the convertible through the driver's side window. Lima testified that he had been waiting for Fiallo-Lopez to give him the cocaine. Lima gave the bag of cocaine to Cooper and asked where the money was.

*Detective Broggi's testimony.* After arriving at Safeway, Detective Broggi waited in the undercover car. Broggi could not always see Lima's convertible because other vehicles blocked her view. Cooper spoke with Lima and later motioned for Broggi to follow with the money. As she walked toward the convertible, Broggi saw Fiallo-Lopez walk in front of her toward the store. She also saw the Blazer parked two or three spaces west of Lima's car. As she approached Lima's car, Cooper was squatting near a blue bag on the ground. They both looked inside the bag and saw what looked like cocaine. Broggi then saw Fiallo-Lopez walk past her and toward the Blazer. Broggi did not see Fiallo-Lopez give Lima the cocaine.

The State charged Fiallo-Lopez with one count of delivery of cocaine based on his involvement in the undercover buy operation. The State also charged him with one count of possession of cocaine based on a small amount of the drug found in the Blazer. The jury found Fiallo-Lopez guilty as charged. He appeals.

## A
### Unanimity Instruction

We first decide whether Fiallo-Lopez was entitled to a unanimity instruction on the charge of delivery of cocaine. Fiallo-Lopez argues that because there were two discrete acts of delivering cocaine—the sample at the restaurant and the baggies of cocaine at Safeway—and the State did not elect one of the acts, the trial court erred by failing to give a unanimity instruction. The State contends that the two deliveries of cocaine were a continuing course of conduct, and thus no election or unanimity instruction was required. We agree with the State.

When the facts show two or more criminal acts

which could constitute the crime charged, the jury must unanimously agree on the same act to convict the defendant. *State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984), *modified by State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988). The State therefore must elect the specific criminal act on which it is relying for conviction, or the trial court must instruct the jury that all the jurors must agree that the same underlying criminal act was proven beyond a reasonable doubt. *Kitchen*, 110 Wn.2d at 411.

But the State need not make an election and the trial court need not give a unanimity instruction if the evidence shows the defendant was engaged in a "continuing course of conduct". *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989); *State v. Craven*, 69 Wn. App. 581, 587, 849 P.2d 681, *review denied*, 122 Wn.2d 1019 (1993). We review the facts in a commonsense manner to decide whether criminal conduct constitutes one continuing act. *Handran*, 113 Wn.2d at 17; *Craven*, 69 Wn. App. at 588.

Courts have considered various factors in determining whether a continuing course of conduct exists in a particular case. Generally, evidence that the charged conduct occurred at different times and places tends to show that several distinct acts occurred rather than a continuing course of conduct. *Handran*, 113 Wn.2d at 17. Evidence of a single victim likewise is not enough in itself to demonstrate that the offense was one continuing offense. *Petrich*, 101 Wn.2d at 571.

In contrast, evidence that a defendant engages in a series of actions intended to secure the same objective supports the characterization of those actions as a continuing course of conduct rather than several distinct acts. *See Handran*, 113 Wn.2d at 17 (the two alleged assaults did not require a unanimity instruction because the defendant's actions showed a continuing course of conduct intended to secure sexual relations with the victim rather than several distinct acts). *Accord State v. Campbell*, 69 Wn. App. 302, 311-13, 848 P.2d 1292 (1993) (because the crime of welfare fraud contemplates a continuing course

of conduct to further the single goal of obtaining public assistance to which the defendant is not entitled, neither an election nor a unanimity instruction is required even though the State could have charged the individual acts as single crimes), *rev'd on other grounds*, 125 Wn.2d 797 (1995).

Moreover, the fact that a crime can be charged as a continuing course of conduct is also a relevant factor in the analysis. *See State v. Craven*, 69 Wn. App. at 588-89 (because child prostitution can be charged either for each act of prostitution or for a continuous course of conduct, failure to give a unanimity instruction was not error); *State v. Gooden*, 51 Wn. App. 615, 620 (promoting prostitution is a continuing course of conduct that does not require a unanimity instruction because, unlike child molestation, it is an "ongoing enterprise"), *review denied*, 111 Wn.2d 1012 (1988).

■ Fiallo-Lopez argues that the State based its case on the contention that he was an accomplice to two separate deliveries of cocaine, one at the restaurant and one at Safeway. He contends that the State had to elect which of the two deliveries supported the delivery charge, or the court had to give a unanimity instruction. Fiallo-Lopez neither proposed a unanimity instruction to the court nor made this argument at trial. However, we are required to consider the argument on appeal because of its constitutional implications. RAP 2.5(a)(3); *State v. Tang*, 75 Wn. App. 473, 478 n.6, 878 P.2d 487 (1994). The State maintains that a *Petrich* instruction was not required on these facts. The State is correct.

■ Fiallo-Lopez's argument fails because the testimony and other evidence show that the drug transaction was a continuing course of conduct. It started with a delivery of a small sample of cocaine at the restaurant and concluded a short time later with the delivery of the remaining eight ounces of drugs in the Safeway parking lot. This was one transaction involving the same parties and having as its ultimate purpose the delivery of drugs by Fiallo-Lopez to

Cooper. As such, the case is comparable to *Handran*, where the defendant committed two assaults aimed at the same purpose. 113 Wn.2d at 17. Unlike *State v. King*, 75 Wn. App. 899, 903, 878 P.2d 466 (1994), *review denied*, 125 Wn.2d 1021 (1995), where there were two separate and distinct quantities of cocaine but only one charge of possession, the facts here show that the delivery of a small sample of cocaine at the restaurant was preliminary to the delivery of the significantly larger amount of cocaine at Safeway a short time later. Thus, the fact that the two deliveries here occurred at different times and places is outweighed by the commonsense consideration that they were both intended for the same ultimate purpose, delivery of cocaine by Fiallo-Lopez to Cooper. *See Handran*, 113 Wn.2d at 17; *Petrich*, 101 Wn.2d at 571. We conclude therefore that a unanimity instruction was not required under the facts of this case.

## B
### Prosecutorial Misconduct

Fiallo-Lopez contends that the prosecutor engaged in four separate acts of misconduct that require reversal of his convictions and a new trial. We disagree.

■■ Defense counsel made no objection to any of the four alleged instances of misconduct. When counsel does not object to a prosecutor's alleged misconduct, request a curative instruction, or move for a mistrial, appellate review of the prosecutor's conduct is precluded unless it was misconduct so flagrant and ill intentioned that no instruction could erase the prejudice engendered by it. *State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988); *State v. Dunaway*, 109 Wn.2d 207, 221, 743 P.2d 1237 *corrected*, 749 P.2d 160 (1987). If unchallenged misconduct was so inflammatory that an instruction would not have cured it, reversal of the conviction is required if there is a substantial likelihood that the misconduct affected the jury's decision. *Belgarde*, 110 Wn.2d at 509-10; *State v. Barrow*, 60 Wn. App. 869, 876, 809 P.2d 209, *review denied*, 118 Wn.2d 1007 (1991).

**Major personality conflict.** Fiallo-Lopez first argues that the prosecutor committed misconduct when he interrupted defense counsel's cross-examination of Lima and said,

> Your Honor, it's obvious that there's a major personality conflict. I would ask that you again instruct the witness exactly what his duties are here. It's going nowhere.

The prosecutor made that comment after Lima resisted answering some of defense counsel's questions. While the comment did personalize the exchange between defense counsel and Lima, any resulting prejudice could have been cured by an instruction if one had been requested. Thus, that asserted error was not preserved for appellate review. *See Belgarde*, 110 Wn.2d at 507.

**Consequences of lying; Fiallo-Lopez as an "experienced drug dealer".** Fiallo-Lopez also contends that the prosecutor engaged in misconduct during closing argument because he said that (1) Cooper and Lima would be subject to prison terms if they were lying, and (2) Fiallo-Lopez was an experienced drug dealer who knew how to insulate himself and make a case difficult to prove. Fiallo-Lopez compares those comments to the misconduct that warranted reversal in *State v. Stith*, 71 Wn. App. 14, 856 P.2d 415 (1993). We find *Stith* distinguishable.

In *Stith*, the prosecutor argued that the defendant, who was charged with possession with intent to deliver, had been "out of jail for a week and he basically was just resuming his criminal ways. He was just coming back and he was dealing again". 71 Wn. App. at 16. This court held that comment was misconduct justifying reversal because it indicated to the jury that Stith's previous conviction was drug related (information which until then had been withheld from the jury), and it also was impermissible opinion testimony that Stith was selling drugs again and therefore was guilty as charged. 71 Wn. App. at 22. Despite "strongly worded curative instructions" as to those remarks, the court held that the misconduct was so preju-

dicial that it was not curable by objection or instruction. 71 Wn. App. at 22-23.

In contrast, the prosecutor's remarks here about the consequences if Cooper or Lima lied were simply reasonable inferences drawn from the evidence. There was testimony as well as documentary evidence before the jury explaining the arrangements between the informants and the police. The prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury. *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991). Moreover, the jury could have drawn the same inferences from the evidence before it, and the trial court instructed the jurors that, in judging credibility, they could take into account "any interest, bias or prejudice" a witness might have had. Thus, there was no misconduct with respect to the comments concerning Cooper and Lima.

Likewise, the comments regarding Fiallo-Lopez being an experienced drug dealer were not improper. His actions in this transaction, as well as the other evidence the jury considered, permitted them to draw the inference that Fiallo-Lopez was, indeed, an experienced drug dealer. Moreover, unlike *Stith*, there was no suggestion by the remark that the defendant had a prior drug conviction. The prosecutor's remark was not misconduct.

**Shifting burden of proof.** Fiallo-Lopez contends that when the prosecutor stated in closing argument that there was no evidence to explain why he was present at both the restaurant and Safeway when Cooper and Lima were negotiating the deal, the prosecutor commented on his decision not to testify and shifted the burden of proof to the defense. We agree.

A prosecutor violates a defendant's Fifth Amendment rights if the prosecutor makes a statement "of such character that the jury would 'naturally and necessarily accept it as a comment on the defendant's failure to testify' ". *State v. Ramirez*, 49 Wn. App. 332, 336, 742 P.2d 726 (1987) (quoting *State v. Crawford*, 21 Wn. App. 146,

152, 584 P.2d 442 (1978), *review denied*, 91 Wn.2d 1013 (1979)). The prosecutor may say that certain testimony is undenied as long as he or she does not refer to the person who could have denied it. *Ramirez*, 49 Wn. App. at 336.

Here, the prosecutor stated in closing argument that there was "absolutely" no evidence to explain why Fiallo-Lopez was present at the restaurant and at Safeway precisely when Lima and Cooper were there for the drug transaction or why he had contact with Lima at both places. Moreover, the prosecutor argued that there was no attempt by the defendant to rebut the prosecution's evidence regarding his involvement in the drug deal. Despite the prosecutor's passing reference to the fact that the defense had no burden to explain Fiallo-Lopez's actions, the State's argument highlighted the defendant's silence. In this case, no one other than Fiallo-Lopez himself could have offered the explanation the State demanded. Because the argument improperly commented on the defendant's constitutional right not to testify and impermissibly shifted the burden of proof to the defendant, it was misconduct.

Prosecutorial misconduct does not necessarily require reversal. " 'A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error' ". *State v. Ng*, 110 Wn.2d 32, 37, 750 P.2d 632 (1988) (quoting *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986)). In spite of the improper argument by the prosecutor, the evidence of guilt is sufficient to convince this court that the improper argument did not affect the result below. We therefore hold that the error was harmless beyond a reasonable doubt.

**If the police were lying, they would have done a better job.** Fiallo-Lopez challenges the following comments by the prosecutor during closing argument:

But, what you're left with is the testimony of a number of

detectives who say exactly the same thing about those particular events [i.e., that Fiallo-Lopez was at Las Margaritas and Safeway during the transactions]. *And if you question the officers' motives, if you think that the cops — to use a popular defense term, the cops are lying, ask yourselves, don't you think they would have done a much better job?* If they made this up, don't you think that they would have gotten together from the start with Mr. Lima and Mr. Cooper and they would have made sure that every single statement, every single description by every single witness was the same?

*The fact is, they didn't. And the fact that they didn't and the fact that differences exist resulting from lapse[s] in time, and differences in perspective, and differences in training indicates that, in fact, everybody is telling the truth* about their honest recollection about what happened. And those common threads cannot be disputed.

(Italics ours.)

Fiallo-Lopez first argues that the prosecutor disparaged defense counsel by saying the phrase "the cops are lying" is "a popular defense term". However, the prosecutor was referring to "the cops", not "the cops are lying", when he said it was a "popular defense term". "Cops" is much less formal than "officers" and tends to have a negative connotation; thus, to say that the word is popular among defense attorneys comes close to being a slight to the defense bar. However, it was not so serious an error that an instruction would not have cured any prejudice flowing from its use. *See Belgarde*, 110 Wn.2d at 507; *Dunaway*, 109 Wn.2d at 221.

Fiallo-Lopez also argues that the prosecutor was improperly vouching for the officers' testimony through his comments. It is improper for the prosecutor to assert a personal opinion about a witness' credibility. *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984). Here, however, the prosecutor was not making a personal statement about his belief that the officers were telling the truth. Instead, he said that the facts indicated the officers were truthful. That is not misconduct. *See Stith*, 71 Wn. App. at 21 (in closing argument, the prosecutor may comment on a wit

ness' veracity if he or she does not express a personal opinion and does not make the comment to incite the passion of the jury) (citing *State v. Stover*, 67 Wn. App. 228, 232, 834 P.2d 671 (1992), *review denied*, 120 Wn.2d 1025 (1993)).

Finally, Fiallo-Lopez contends that this argument was misconduct because it implied he could be innocent only if the officers were lying. Such comments are unmistakably misconduct. *See State v. Wright*, 76 Wn. App. 811, 824-26, 888 P.2d 1214 (1995). Here, however, the prosecutor was not saying that the jury could acquit Fiallo-Lopez only if they disbelieved the officers. He argued instead that the facts supported the conclusion that the State's witnesses were being truthful. That is not misconduct.

We affirm the judgment and sentence.

BAKER, C.J., and COLEMAN, J., concur.