IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | ) No. 76958-8-I |
| Respondent, | ) |
| | ) DIVISION ONE |
| v. | ) |
| | ) |
| ROBERT DANIEL SMITH, JR., | ) UNPUBLISHED OPINION |
| | ) |
| Appellant. | ) FILED: January 14, 2019 |

SMITH, J. — Robert Smith Jr. appeals his conviction for third degree assault against a law enforcement officer. Smith argues that the trial court erred in admitting an incriminating statement Smith made after he invoked his right to remain silent. He also argues that the prosecutor committed reversible misconduct during closing argument by improperly commenting on Smith's right to remain silent. But Smith's incriminating statement was not the result of police interrogation, and the prosecutor's statement during closing argument was not an improper comment on Smith's right to remain silent. Therefore, we affirm.

FACTS

On January 19, 2017, at 11:14 p.m., Snohomish County Sheriff's Deputy Evan Twedt responded to a 9-1-1 report that an individual was walking in the middle of the street in Snohomish. When Deputy Twedt arrived, he observed a man, later identified as Smith, walking in the eastbound lane of traffic and carrying a duffle bag.

Deputy Twedt parked and got out of his patrol car, and Smith walked toward him. Smith appeared "relaxed, calm, and inviting to talk to." Smith said that he almost got hit by a car, and in response, Deputy Twedt asked Smith his name. Smith "chuckled and laughed and said, 'No, what is your name?'" Deputy Twedt responded that his name was Deputy Twedt and again asked Smith his name. Then,

> [Smith's] total posturing changed. He dropped one foot back and started walking towards me. He dropped off the bag over his shoulder, and his fists were balled—his hands were balled into fists. His shoulders were kind of set back. His chest was puffed out as he started walking towards me.

Smith "scrunched up his face as if he appeared angry." When he was within four or five feet of Deputy Twedt, Smith lowered his voice in a stern manner and demanded, "'No, what is your name?'" Deputy Twedt took a couple of steps back and, anticipating a fight or attack based on Smith's change in behavior, asked Smith, "'Do you really want to do this?'" Smith replied, "'Yes, we're doing this.'" Deputy Twedt immediately called for backup because he believed an attack was imminent.

Smith tried to reach into his bag, but Deputy Twedt grabbed his arm and spun him around to prevent him from doing so. A physical altercation ensued, and Smith struck Deputy Twedt several times. Sergeant Michael Sutherland arrived while Smith and Deputy Twedt were struggling on the ground and helped Deputy Twedt handcuff Smith.

Deputy Daniel Uhrich arrived on the scene after Smith was handcuffed. He then conducted a search incident to arrest and secured Smith in the back of

2

his patrol car. Shortly thereafter, Deputy Uhrich transported Smith to Providence Hospital and stayed in the hospital with Smith for approximately half an hour. During the car ride and in the hospital, Deputy Uhrich and Smith repeatedly engaged in a conversation where Smith would ask why he was under arrest and then debate with Deputy Uhrich whether or not he assaulted Deputy Twedt. In one instance of this conversation that took place in the hospital, Smith told Deputy Uhrich, "'I didn't really fight him. If I had wanted to, then I could have killed him.'"

Deputy Matthew Houghtaling was appointed the primary investigating officer in the case. After taking pictures at the scene, Deputy Houghtaling went to Smith's hospital room to relieve Deputy Uhrich and work on his report. When he arrived, Deputy Houghtaling read Smith his Miranda[1] rights for the first time, and Smith expressed a desire to remain silent. Deputy Uhrich then instructed Deputy Houghtaling to include in the report Smith's comment that he could have killed Deputy Twedt if he had wanted to. Smith overheard this instruction and responded by telling Deputy Houghtaling that "some time down the road the same thing was going to happen to [him]."[2]

The State charged Smith with third degree assault. The trial court held a CrR 3.5 hearing to determine whether Smith's statements to Deputy Uhrich and Deputy Houghtaling were admissible. The court held that Smith's conversations

---

[1] Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] At the CrR 3.5 hearing, the court found that Smith's statement to Deputy Houghtaling was, "It's going to happen to you, too." The meaning of both statements is materially the same.

3

with Deputy Uhrich about the basis for his arrest were spontaneous statements, not the product of interrogation, and were admissible and that Smith's statement to Deputy Houghtaling was also admissible. But, the court found that Smith's statement to Deputy Uhrich that Smith could have killed Deputy Uhrich was the product of interrogation and not admissible. During the jury trial, Sergeant Sutherland and Deputies Twedt, Uhrich, and Houghtaling, each testified. Smith did not testify.

In closing argument, the prosecutor argued that all elements of the crime were satisfied and that the witnesses presented by the State were credible and painted an "unrefuted" picture of what happened. Defense counsel argued that Smith was simply resisting arrest and that the State failed to prove Smith intended to assault Deputy Twedt, as required to convict.

The jury found Smith guilty, and the trial court sentenced him to 10½ months of confinement. Smith appeals.

## SUPPRESSION OF SELF-INCRIMINATING STATEMENT

Smith argues that the trial court erred by failing to suppress Smith's statement to Deputy Houghtaling because it was the result of interrogation after Smith invoked his right to remain silent.[3] We disagree.

The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against

---

[3] In his opening brief, Smith assigned error to the fact that no written findings of fact or conclusions of law were entered under CrR 3.5. The State filed those findings and conclusions on January 5, 2018, and Smith has abandoned this assignment of error.

4

himself." See also WASH. CONST. art. I § 9. To preserve an individual's right against compelled self-incrimination, police must inform a suspect of his rights before custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Under Miranda, once the warnings are given, if an individual "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74. Interrogation occurs "'whenever a person in custody is subjected to either express questioning *or* its functional equivalent'" such as "'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" State v. Wilson, 144 Wn. App. 166, 184, 181 P.3d 887 (2008) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)). "The last part of the definition focuses on the perceptions of the suspect, rather than on the intent of the police." Wilson, 144 Wn. App. at 184. "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." Miranda, 384 U.S. at 478.

"[F]indings of fact entered following a CrR 3.5 hearing will be verities on appeal if unchallenged; and, if challenged, they are verities if supported by substantial evidence in the record." State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). We determine de novo whether the trial court's conclusions of law properly derive from its findings of fact. State v. Solomon, 114 Wn. App. 781, 789, 60 P.3d 1215 (2002).

5

Here, the trial court held a CrR 3.5 hearing on May 12, 2007. The following relevant findings of fact and conclusions of law were entered on January 5, 2018, while this appeal was pending:

> 1.5 On the way to the hospital and eventually in the hospital room, the defendant and Deputy Uhrich had an ongoing conversation in which the defendant repeatedly asked why he was under arrest and Deputy Uhrich answered "for assaulting an officer." The defendant denied assaulting an officer, and Deputy Uhrich responded with facts that essentially stated the officer's contrary view – that the defendant did assault an officer because there was a physical confrontation in which both were injured. This conversation happened multiple times in the patrol car and at least once in the hospital room.
>
> 1.6 During one iteration of the above conversation, which took place in the hospital room, the defendant told Deputy Uhrich, "I didn't really fight him. If I had wanted to, then I could have killed him."
>
> 1.7 Deputy Houghtaling arrived to assist Deputy Uhrich in the hospital room. Deputy Uhrich, in the defendant's presence, told Deputy Houghtaling about the defendant's "I could have killed him" comment. Deputy Uhrich told Deputy Houghtaling to write it down. The defendant then told Deputy Houghtaling, "It's going to happen to you, too."

Smith does not challenge these facts, and they are verities on appeal. The trial court also entered the following conclusion of law:

> 3.4 The defendant's statement to Deputy Houghtaling, "It's going to happen to you, too," was spontaneously made. It was elicited following Deputy Uhrich informing Deputy Houghtaling about the defendant's "I could have killed him" comment, and Deputy Uhrich telling Deputy Houghtaling to include that statement in his report. This conversation between two Deputies, even in the defendant's presence, was not the functional equivalent of interrogation under the facts of this case. Therefore the defendant's comment, "It's going to happen to you, too," is admissible pursuant to CrR 3.5.

Smith challenges this conclusion.

The trial court did not err in concluding that Smith's statement to Deputy Houghtaling was admissible. When the statement was made, Houghtaling had read Smith his <u>Miranda</u> rights and Smith had exercised his right to remain silent. Deputy Uhrich's instruction to Deputy Houghtaling to put Smith's previous statement in the report was not interrogation because it was merely a conversation between two deputies in Smith's presence and was not the functional equivalent of express questioning.

Smith argues that Deputy Uhrich's instruction to Deputy Houghtaling was an interrogation because Deputy Uhrich should have known that the statement would elicit a response from Smith given their previous ongoing conversation about the underlying basis for Smith's arrest. But Deputy Uhrich's statement to Deputy Houghtaling was reasonable under the circumstances and did not call for a response from Smith. <u>See</u> <u>State v. Breedlove</u>, 79 Wn. App. 101, 112-13, 900 P.2d 586 (1995) (officer's accusatory response to defendant's inquiry did not call for a response, and the officer could not have known his statement would elicit an incriminating response); <u>State v. Webb</u>, 64 Wn. App. 480, 486, 824 P.2d 1257 (1992) (same). Furthermore, the record does not suggest that Deputy Uhrich knew Smith was "unusually disoriented or upset" at the time of the statement. <u>Innis</u>, 446 U.S. at 303. Therefore, this argument is not persuasive.

Smith also argues that Deputy Uhrich could have included the statement in his own report and the only reason for repeating it to Deputy Houghtaling was to incite Smith into making an incriminating statement. But the record shows that there were other proper reasons for Deputy Uhrich's instruction: Deputy

Houghtaling was the primary investigating officer in the case and was working on his report while in Smith's hospital room. Therefore, this argument fails.

Finally, Smith argues that Wilson is controlling and requires reversal. It does not. In that case, the defendant was arrested, interrogated by police, and advised of her Miranda rights after she stabbed her boyfriend. Wilson, 144 Wn. App. at 182. The police ceased questioning her when she made a reference to an attorney. Wilson, 144 Wn. App. at 182. Later, an officer reentered the interrogation room to tell the defendant that her boyfriend had died. Wilson, 144 Wn. App. at 182-83. She responded, "'I didn't mean to kill him. I didn't mean to stab him.'" Wilson, 144 Wn. App. at 183 (internal quotation marks omitted). The Court of Appeals held that the officer should have known that the death notification was reasonably likely to elicit an incriminating response. Wilson, 144 Wn. App. at 184.

Smith is not in the same position as the defendant in Wilson. Deputy Uhrich did not deliver emotionally charged news to Smith that was likely to elicit an incriminating response. Nothing in the record suggests that Deputy Uhrich's recitation of Smith's previous statement to Deputy Houghtaling for the police report was reasonably likely to elicit an incriminating response. Therefore, the trial court did not err in holding that Smith's subsequent statement to Deputy Houghtaling was admissible.

## PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

Smith argues that the prosecutor's reference to the police officers' testimony as "unrefuted" was prosecutorial misconduct because it was an improper comment on Smith's decision not to testify at trial. We disagree.

"To prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)).

"The State may not use a defendant's constitutionally permitted silence as substantive evidence of guilt." State v. Romero, 113 Wn. App. 779, 787, 54 P.3d 1255 (2002). It is well settled that the State violates due process where it comments on a defendant's exercise of his right to remain silent. Id. at 786-87. But a "prosecutor may say that certain testimony is undenied as long as he or she does not refer to the person who could have denied it." State v. Fiallo-Lopez, 78 Wn. App. 717, 729, 899 P.2d 1294 (1995).

Here, during closing argument, the prosecutor explained the importance of the jury's role in assessing the credibility of the witnesses at trial. He explained:

> it is my hope that now after hearing four people testify to you live
> and in person with some photographs, but not a whole lot of
> physical evidence, no video, that you now know from hearing
> people testify credibly and observing them in a way that you come
> into this jury box with significant skills and experience under your
> belt, collectively hundreds of years of experience in assessing
> people, in listening to them talk, in hearing do I believe this person?
> Do I have a reason to disbelieve this person?
>     If you go through that process with the testimony of Deputy
> Twedt, Sutherland, Uhrich, and Houghtaling, together it paints a

picture that is *unrefuted* and it is credible about what exactly happened in this case.[4]

This statement was not improper. Although the prosecutor did refer to the officers' testimony as "unrefuted," he did not refer to Smith as the one who could refute that testimony. Therefore, reversal is not warranted because the comment was not a violation of Smith's rights and did not constitute prosecutorial misconduct. Cf. Fiallo-Lopez, 78 Wn. App. at 729 (prosecutor improperly commented on the defendant's silence when the prosecutor argued that defendant did not attempt to rebut the prosecution's evidence).

We affirm.

WE CONCUR:

---

[4] (Emphasis added.)