**FILED**
**AUGUST 9, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38259-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| SARAH B. ZIMMERMAN, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Sarah Zimmerman appeals her conviction for promoting prostitution. At trial, the State's witnesses testified about several instances in which Ms. Zimmerman promoted prostitution of Jane D.[1] On appeal, Ms. Zimmerman argues the State failed to select which act it relied on to convict so the trial court committed reversible error by not providing the jury with a *Petrich*[2] instruction, which would require jury unanimity on a specific instance of criminal conduct. Ms. Zimmerman did not request such an instruction or otherwise raise unanimity at trial. Because promoting prostitution can be proved by evidence that the accused was engaged in an enterprise of prostitution, the claimed constitutional error is not manifest and we do not review it. We affirm Ms. Zimmerman's conviction.

_____

[1] Jane D. is a victim of sex trafficking. We elect to use a pseudonym rather than her true name.

[2] *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984).

FACTS

Jane D. grew up in Pennsylvania. She met Raymond Mays when she was around 18 years old and the two began dating. They later moved to Spokane, Washington, and began living with one of Mr. Mays's friends. Shortly thereafter, Mr. Mays set up several online profiles for Ms. D. where he posted pictures and listed the sexual acts she would perform for money.

While in Spokane, Ms. D. had over 200 sexual encounters under the direction of Mr. Mays; he kept most of the money she earned. When Ms. D. refused to make him money, Mr. Mays would choke her, throw her against walls, punch her, and lock her in rooms without food or water.

Ms. D.'s activities came to the attention of law enforcement in May or June 2019. Agents in the human trafficking task force set up sting operations, but none were successful. In late July 2019, Mr. Mays was arrested and incarcerated.[3] After Mr. Mays's arrest, Mr. Mays's friend told Ms. D. to leave his home.

Ms. D. moved in with Sarah Zimmerman, whom she had met a few months earlier. Initially, they did not discuss financial obligations, but they later agreed that Ms. D.

---

[3] The record is unclear as to why Mr. Mays was arrested.

would pay $300 per month in rent. Ms. D. continued prostitution after she moved in; she went on between 200 and 300 dates at Ms. Zimmerman's house.

In the fall of 2019, Ms. Zimmerman took Ms. D. with her on two trips. They first went to Oregon to see Ms. Zimmerman's "sugar daddy"[4] and get money for both of them. Report of Proceedings (RP) at 211. They later went to Wyoming where they engaged in escort work.

While Mr. Mays was incarcerated, he frequently called Ms. D. and sometimes spoke with Ms. Zimmerman afterward. Law enforcement monitored the jail calls and ultimately obtained a search warrant for Ms. Zimmerman's house. The search revealed Ms. D.'s social security card, clothing, and handbags. The police did not find any weapons on the premises.

*Procedure*

On April 23, 2020, the State charged Ms. Zimmerman with promoting prostitution in the second degree. The information alleges "on or about between May 1, 2019 to April 1, 2020," Ms. Zimmerman "did knowingly advance the prostitution of" Ms. D. Clerk's Papers (CP) at 1.

---

[4] Ms. Zimmerman defined "sugar daddy" as "a person that supplies me with money and gifts because he likes me." RP at 211.

3

The case proceeded to trial in May 2021. The following testimonies are relevant to this appeal.

*Ms. D.*

Ms. D. testified that Mr. Mays introduced her to Ms. Zimmerman because she needed "a big sister." RP at 112. Mr. Mays arranged for Ms. D. to live with Ms. Zimmerman after he went to jail. Ms. D. said she engaged in prostitution at Ms. Zimmerman's direction "because I would get threatened with a baseball bat, a gun and knives if I didn't work." RP at 113. Ms. Zimmerman told Ms. D. to "walk the streets" when Ms. Zimmerman's boyfriend was over or when Ms. D. did not get out of bed. RP at 117. Ms. Zimmerman directed Ms. D. to do this until she made the money she owed. When Ms. D. did not work, Ms. Zimmerman punished her by making her do household chores.

On the Wyoming trip, Ms. D. went on 10 or 20 dates at Ms. Zimmerman's direction. One evening, Ms. Zimmerman slapped Ms. D. across the face so she would "hurry up and get done smoking" her cigarette because a date was coming over. RP at 115. In Oregon, people were not responding to Ms. D.'s ads so she went on fewer dates—this angered Ms. Zimmerman. When they returned to Spokane, Ms. Zimmerman threw a bucket of water on Ms. D. and threatened her again with a knife, a bat, and a gun.

Ms. Zimmerman safeguarded most of Ms. D.'s earnings because, according to Ms. D., she would "buy stupid things that [she] didn't need." RP at 114. They also put Ms. D.'s earnings on Ms. Zimmerman's bank card and transferred money to Mr. Mays in jail that way.

Ms. Zimmerman gave Ms. D. Xanax, methamphetamine, and heroin. Ms. D. testified: "I was pale as a ghost; my eyes were going white (indicating); um, I couldn't barely move at all; um, I kept falling over. So I was being drugged for doing something I did not do, when I didn't want to do what I was told to do." RP at 118. Ms. D. was intoxicated for about one-half of the dates she went on.

Ms. Zimmerman and Ms. D. went on some dates where they both performed sexual acts with men; this was advertised as "duo sex" or a "two girls special." RP at 124. Ms. D. confirmed that Ms. Zimmerman posted "duo" ads for them both on June 28, August 10, August 24, and October 17. Ms. D. took and posted pictures of herself and Ms. Zimmerman wrote details about the services Ms. D. provided. Ms. D. never wrote her own ads. Ms. D. confirmed that in a September 19 ad, Ms. Zimmerman captioned Ms. D.'s photo: "'I'm the girl to make your day amazing. Come see me at my private residence near Havana and Sprague.'" RP at 130. The private residence was Ms. Zimmerman's house.

Ms. D. perceived Mr. Mays's telephone conversations with Ms. Zimmerman to be secretive. Mr. Mays ultimately disclosed to Ms. Zimmerman that he had cheated on Ms. D. When Ms. D. learned of this, she stopped prostitution and left Ms. Zimmerman's house.

*Jason Benedetti*

Special Agent Jason Benedetti works for the Federal Bureau of Investigation in the Spokane Child Exploitation and Human Trafficking Task Force. Agent Benedetti listened to hundreds of Mr. Mays's outgoing jail calls. The calls occurred in a similar manner: Mr. Mays called his father in Pennsylvania who would initiate a three-way call to either Ms. Zimmerman or Ms. D. Agent Benedetti took notes on the content of the calls and created a spreadsheet. He testified about the following calls:

On August 5, 2019, Ms. Zimmerman told Mr. Mays that Ms. D. had been "[']making her bread[5] and doing the right thing.[']" RP at 172. Mr. Mays said "he appreciated Ms. Zimmerman taking care of [Ms. D.]." RP at 172. Ms. Zimmerman replied that Ms. D. "was behaving and making money" and when asked whether she was saving, stated, "[Ms. D.] can't touch any more money." RP at 172-73. They discussed taking Ms. D. to a health clinic to get her tested for sexually transmitted diseases. Ms.

---

[5] "'Bread'" in this sense means money. RP at 172.

Zimmerman said that when Ms. D. asked to stay with a friend, Ms. Zimmerman responded, "'Oh, hell, no, bitch.'" RP at 174. Mr. Mays said he supported Ms. Zimmerman, and stated: "if someone isn't about making money or bettering herself or putting someone in pocket[6] . . . 'What good is she?'" RP at 174.

On August 16, 2019, Mr. Mays asked Ms. Zimmerman, "[']How you doing, boss lady?[']" RP at 175-76. He "had heard that [Ms. D.] had been giving Ms. Zimmerman headaches." RP at 176. Ms. Zimmerman responded that Ms. D. "was being a 19-year-old girl, that she's learning." RP at 176. Ms. Zimmerman said she told Ms. D. to "[']step your game up[']" and threatened to leave her at a shelter. RP at 177.

On September 24, 2019, Ms. Zimmerman told Mr. Mays she was getting "[']tired of that shit[']" in reference to Ms. D., and complained that "['][i]t's been three months['] . . . [she] should know the routine." RP at 182. The routine was to "clean the house, make money, and go out and do their thing at night." RP at 182.

---

[6] In the prostitution world, "'in pocket'" means following the rules or being under control of someone else. RP at 174-75.

On October 2, 2019, Ms. Zimmerman told Mr. Mays that "the main problem with [Ms. D.] is she is not motivated and she doesn't want to make more money," which was irritating. RP at 183. Ms. Zimmerman told Mr. Mays they were going to Portland because she had "[']shit lined up[']" with her "[']sugar daddy[']" there. RP at 183-84.

On October 10, 2019, Ms. Zimmerman told Mr. Mays that "[Ms. D.] doesn't know how to [']respond to motherfuckers, talk to motherfuckers.[']" So Ms. Zimmerman said she had to do everything for Ms. D. to [']make anything happen.[']" RP at 186. When Ms. Zimmerman saw Ms. D. had seven missed calls, she told her: "[']There's all your dough[']" and "there is never a convenient time . . . ." RP at 187. Ms. Zimmerman told Mr. Mays that she was "making racks"[7] while Ms. D. was "making change" and Ms. D. "needs to get up and get that money." RP at 187. Ms. Zimmerman told Ms. D., "[']Bitch, you got to push[']" and "[']][l]ife is passing you by. All this money is passing you by. You're talking to people for free.[']" RP at 188.

On November 4, 2019, Ms. Zimmerman told Mr. Mays that Ms. D. left. Mr. Mays asked what happened, and "wanted to be sure that [Ms. D.] didn't disrespect Ms. Zimmerman." RP at 190. Ms. Zimmerman said Ms. D. misbehaved in Wyoming by "not being down to business." RP at 190. Ms. Zimmerman complained that she "gave [Ms.

---

[7] A "'rack'" is $1,000. RP at 187-88.

D.] many opportunities to make money and improve her lifestyle but [Ms. D.] did not take advantage." RP at 191. They agreed that Ms. D. was "['] a kid.[']" RP at 191. Still, Ms. D. had "made a lot of money in Wyoming" and Ms. Zimmerman said she would send it to Mr. Mays but keep a few hundred dollars for herself. RP at 192.

*Ms. Zimmerman*

Ms. Zimmerman testified that Ms. D. tried to befriend her online. When Mr. Mays went to jail, Ms. D. called and asked to stay at Ms. Zimmerman's house. Ms. Zimmerman said she could stay on the couch for $300 per month if she agreed to clean every day, do dishes, and help around the house. Ms. D. told Ms. Zimmerman she was a "street worker" or prostitute. RP at 206. Ms. Zimmerman never asked for money from Ms. D. other than for rent, which she believed came from a state cash assistance program rather than from prostitution.

Ms. Zimmerman owns a construction and cleaning company and offers toy and prostate massage services. She also works as a dancer and escort. She mostly works in hotels but sometimes uses her house. Ms. Zimmerman advertises her services on the Internet. Ms. D. taught Ms. Zimmerman how to use a different Internet platform that she used when she lived in Pennsylvania. Ms. Zimmerman posted "duo" ads for the two

9

women, but never for Ms. D. alone because the websites do not allow a user to post on someone else's behalf.

Ms. Zimmerman denied providing drugs to Ms. D. Ms. D. told her when she moved in that her hobbies were "to do meth and get drunk." RP at 210. Ms. Zimmerman talked to Mr. Mays on the phone because Ms. D. had a methamphetamine habit and relapsed a lot, so Mr. Mays wanted to see how she was doing. Outside of their connection to Ms. D., Ms. Zimmerman and Mr. Mays did not have a relationship.

Ms. Zimmerman asked Ms. D. to leave her house after Ms. D. spent a weekend with friends "doing meth heavily" and, upon return, brought bed bugs into the house. RP at 227-28.

*Jury instructions*

Jury instructions were discussed three times. After the first day of testimony, the court told the parties it had the State's proposed instructions and asked whether the defense had any other instructions. The defense responded: "I don't believe so, Judge. I'll review those tonight, though, and bring those in the morning if we have any. But at this point I don't think so." RP at 160.

After Ms. Zimmerman testified, the court asked whether her counsel had a chance to look at the jury instructions. Counsel responded, "Judge, the only thing that defense is

requesting is that the instruction that references the abiding belief, that that sentence be

stricken . . . ." RP at 243. The court agreed without further discussion.

After a noon recess, the court again asked the parties to take objections or

exceptions to the instructions. The State renewed its objection to striking the abiding

belief language, which the court noted but denied. Ms. Zimmerman's counsel stated,

"Nothing further, your Honor . . . ." RP at 245.

The court gave the jury instructions as agreed on by the parties. They included the

standard instructions, including that the jury must discuss the case and deliberate in an

effort to reach a unanimous verdict. The jury was also instructed: "A person commits the

crime of promoting prostitution in the second degree when he or she knowingly advances

prostitution." CP at 36 (Instruction 6).

The "to convict" instruction read:

> To convict the defendant of the crime of promoting prostitution in
> the second degree, each of the following elements of the crime must be
> proved beyond a reasonable doubt:
> (1)  That on or about and between May 01, 2019 to April 1, 2020, the
> defendant knowingly advanced prostitution; and
> (2)  That any of these acts occurred in the State of Washington.

CP at 37 (Instruction 7).

A later instruction provided definitions:

> The term "advanced prostitution" means that a person, acting other than as a prostitute or as a customer of a prostitute, caused or aided a person to commit or engage in prostitution or procured or solicited customers for prostitution or provided persons or premises for prostitution purposes or operated or assisted in the operation of a house of prostitution or prostitution enterprise *or engaged in any other conduct designed to institute, aid, or facilitate an act or enterprise of prostitution.*

CP at 40 (Instruction 10) (emphasis added).

*Closing arguments and verdict*

In closing, the prosecutor explained that "'advanced prostitution'" can be proved by any one of the listed activities in the jury instructions. RP at 270. Ms. Zimmerman "'caused or aided'" Ms. D. to engage in prostitution by posting advertisements and providing a location. RP at 271. She "'procured or solicited customers'" for Ms. D. by posting on the websites, and she "'provided persons or premises for prostitution purposes'" and "'operated . . . a house of prostitution'" in her own house, where Ms. D. said all of the dates occurred. RP at 271-72. Finally, the prosecutor argued Ms. Zimmerman operated "'a prostitution enterprise or engaged in any other conduct designed to institute, aid, or facilitate an act or enterprise of prostitution'" through the sex advertisements she posted online. RP at 272. The prosecutor noted that "[a]ll of that is causing or aiding a person to commit or engage in prostitution." RP at 271.

12

The prosecutor argued that the advertisements "give you a lot of time frame for when this occurred, all within the charged time frame of 2019 and going into the early months of 2020." RP at 273. The jail calls also gave "some concrete parameters to the time frames that we're talking about." RP at 273.

The prosecutor argued that Ms. Zimmerman took over Mr. Mays's role in coercing, abusing, and threatening Ms. D. into a life of prostitution. The prosecutor discussed—by date—several of the incriminating jail calls where Mr. Mays referred to Ms. Zimmerman as "'boss lady'" and she discussed Ms. D.'s maturity, cooperativeness, and motivation. RP at 274. In one call, Ms. Zimmerman said Ms. D. "doesn't know how to, quote, respond" to potential clients so "Ms. Zimmerman has to do everything for her to make anything happen." RP at 275. The prosecutor argued this was "[p]robably one of the most compelling pieces of evidence in this case, Ms. Zimmerman's own words that she is the one that has to do everything to make anything happen." RP at 275. After Ms. D. moved in, she had "two to three hundred sex dates, ten to twenty duo sex dates with Ms. Zimmerman. Ms. Zimmerman provided her drugs and alcohol, provided the residence." RP at 274.

The defense acknowledged that Ms. Zimmerman is herself a prostitute, but she was "not guilty of promoting prostitution, and there's the distinction." RP at 277. The

13

defense reminded the jury it had to find that Ms. Zimmerman "advanced it, right?  [S]he benefited from it; she arranged it; she controlled it.  She arranged and controlled her own little enterprise.  She's an entrepreneur."  RP at 277.  Although Ms. Zimmerman led an unconventional life and "promotes herself in doing that kind of work. . . .  The issue is whether or not she was promoting or advancing."  RP at 278.  The defense emphasized that Ms. D. was a prostitute before she met Ms. Zimmerman; so "it's certainly possible that she did some of her own promoting."  RP at 279.

The defense also argued the jail calls were taken out of context.  The women lived together; Ms. Zimmerman complained about "'a domestic relationship'" that was frustrating.  RP at 280.  Ms. Zimmerman never threatened Ms. D., no one found weapons in the home, and there were there no visible signs of abuse.

The defense argued that the prostitution enterprise was between Mr. Mays and Ms. D.—not Ms. Zimmerman.  Mr. Mays was the one promoting prostitution, wanting a piece of the proceeds, and asking Ms. D. to pay his bills and put money on his books.  Ms. Zimmerman, in contrast, never took Ms. D.'s money; she instead gave her a place to live and looked after her.

On May 26, 2021, the jury found Ms. Zimmerman guilty as charged.  The trial court sentenced Ms. Zimmerman to 30 days of house arrest by electronic monitoring.

14

Ms. Zimmerman timely appeals.

ANALYSIS

UNANIMITY INSTRUCTION

Ms. Zimmerman contends her right to a unanimous jury verdict was violated because the State did not elect which of the numerous acts it alleged supported the conviction, and the trial court did not instruct the jury on unanimity. We disagree.

"Under Washington law, criminal defendants are entitled to a unanimous verdict." *In re Pers. Restraint of Mulamba*, 199 Wn.2d 488, 507, 508 P.3d 645 (2022). In other words, "a defendant may be convicted only when a unanimous jury concludes that the criminal act charged in the information has been committed." *State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984). "When the evidence indicates that several distinct criminal acts have been committed, but [the] defendant is charged with only one count of criminal conduct, jury unanimity must be protected." *Id.* at 572.

To protect the defendant's right to unanimity, the State must either elect a single act on which it relies or the trial court must instruct the jury to "agree that the same underlying criminal act has been proved beyond a reasonable doubt." *Id.* A defendant's constitutional rights are violated when either of these options is not pursued. *State v.*

15

*Kitchen*, 110 Wn.2d 403, 409, 756 P.2d 105 (1988). We review alleged constitutional

violations de novo. *State v. Armstrong*, 188 Wn.2d 333, 339, 394 P.3d 373 (2017).

However, these requirements under *Petrich* apply "only when the State presents

evidence of several distinct criminal acts." *State v. McNearney*, 193 Wn. App. 136, 141,

373 P.3d 265 (2016) (citing *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989)).

*Petrich* does not apply where the evidence indicates a "continuing course of conduct."

101 Wn.2d at 571; *Mulamba*, 199 Wn.2d at 508 (explaining that unanimity instructions

are not needed for continuing course of conduct cases).

The State concedes it did not elect which of the numerous acts it relied on to prove

the promoting prostitution charge. It instead argues that the acts were part of a continuing

course of conduct, but first urges this court to decline to address the alleged instructional

error because Ms. Zimmerman failed to preserve it for appeal.

*RAP 2.5(a)*

Generally, we do not review arguments raised for the first time on appeal.

RAP 2.5(a). "Although this rule insulates some errors from review, it encourages parties

to make timely objections, gives the trial judge an opportunity to address an issue before

it becomes an error on appeal, and promotes the important policies of economy and

finality." *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). This ensures

16

review of meritorious claims without treating RAP 2.5(a) as a method to secure a new trial every time any error is overlooked. *Id.* at 583. An exception to this rule is when the appellant demonstrates a "manifest error affecting a constitutional right." RAP 2.5(a)(3).

We ask two questions before reviewing an unpreserved error: (1) is the alleged error "truly of a constitutional magnitude," and if so, (2) can the appellant demonstrate that the alleged error is "manifest?" *Kalebaugh*, 183 Wn.2d at 583.

*Constitutional magnitude*

Ms. Zimmerman argues, and the State concedes, that an alleged deprivation of a defendant's right to a unanimous jury verdict is of constitutional magnitude. We agree. *See State v. Bobenhouse*, 166 Wn.2d 881, 893, 214 P.3d 907 (2009); *State v. Moultrie*, 143 Wn. App. 387, 392, 177 P.3d 776 (2008); *State v. Fiallo-Lopez*, 78 Wn. App. 717, 725, 899 P.2d 1294 (1995); *State v. Camarillo*, 115 Wn.2d 60, 63 n.4, 794 P.2d 850 (1990).

*Manifest error*

The State argues the alleged error is not manifest. To establish manifest error, Ms. Zimmerman must show actual prejudice. "[T]he focus of this analysis is on whether the error is so obvious on the record as to warrant appellate review." *McNearney*, 193 Wn. App. at 142 (citing *State v. O'Hara*, 167 Wn.2d 91, 99-100, 217 P.3d 756 (2009)). An

appellant bears the burden of showing that the alleged error "had practical and identifiable consequences" at trial. *Id.* To determine whether an error meets this standard, we place ourselves in the shoes of the trial court to decide whether, given what the trial court knew, it could have corrected the error. *O'Hara*, 167 Wn.2d at 100. "It is not the role of an appellate court on direct appeal to address claims where the trial court could not have foreseen the potential error or where the prosecutor or trial counsel could have been justified in their actions or failure to object." *Id.*

*Continuing course of conduct*

To answer whether the alleged unanimity error was obvious such that the trial court could have foreseen and corrected it, we must determine whether the State relied on multiple acts (necessitating a unanimity instruction) or a continuing course of conduct to convict Ms. Zimmerman of advancing prostitution.[8]

To determine whether one continuing course of conduct may be charged, the facts must be evaluated in a commonsense manner. *McNearney*, 193 Wn. App. at 141. Evidence that a defendant engaged in a series of actions intended to secure the same

---

[8] Under RCW 9A.88.080(1), "A person is guilty of promoting prostitution in the second degree if he or she knowingly: (a) Profits from prostitution; or (b) Advances prostitution." The State charged Ms. Zimmerman with advancing prostitution, so we do not discuss RCW 9A.88.080(1)(a).

18

objective indicates a continuing course of conduct. *Fiallo-Lopez*, 78 Wn. App. at 724.

Conversely, "evidence that the charged conduct occurred at different times and places

tends to show that several distinct acts occurred rather than a continuing course of

conduct." *McNearney*, 193 Wn. App. at 141.

Our Supreme Court addressed whether promoting prostitution can be committed

by a continuing course of conduct in *State v. Elliott*, 114 Wn.2d 6, 785 P.2d 440 (1990).

There, the defendant operated an escort service from her residence for nearly two years.

*Id.* at 9. The State charged her with two counts of promoting prostitution under RCW

9A.88.080(1)(a) and (b). *Id.* at 10. Count 1 was based on her conduct involving one

employee over a year-long period and count 2 was based on her conduct involving

another employee over a month-long period. *Id.* at 8. A jury found her guilty as charged.

Elliott appealed, arguing the State was required to elect whether to charge

promoting prostitution by advancing an enterprise of prostitution or by advancing

individual acts. *Id.* at 11. The Supreme Court disagreed and affirmed, reasoning that

advancing prostitution may be committed by either assisting or operating an enterprise of

prostitution or causing or aiding a person to engage in prostitution. *Id.* at 12 (citing

RCW 9A.88.060(1)). "An offense charging either of these alternative means could be

based upon separate specific acts or upon a continuing offense." *Id.* (citing *Petrich*, 101

19

Wn.2d 566). A continuing offense may be charged without specifying the individual acts of criminal conduct. *Id.* at 13. The court held that the evidence showed two separate continuous courses of conduct and the charges were clearly based on advancing the prostitution of different women for separate time periods and from separate locations. *Id.* at 13-14. Thus, under *Elliott*, an advancing prostitution charge can be based on a continuing course of conduct.

Here, the State charged Ms. Zimmerman with advancing prostitution of Ms. D. "on or about between" May 2019 and April 2020. CP at 1. This charge is based on advancing prostitution through a continuous course of conduct. Indeed, the testimony established that throughout the months that Ms. D. lived with Ms. Zimmerman, Ms. Zimmerman advertised, encouraged, facilitated, and provided a location for Ms. D.'s prostitution. In closing, the prosecutor argued that "[a]*ll of that* is causing or aiding a person to commit or engage in prostitution." RP at 271 (emphasis added).

Moreover, the State did not focus on individual acts. Testimony about specific dates corresponded to Mr. Mays's jail calls, in which Ms. Zimmerman discussed the ongoing prostitution activities. Although the State elicited testimony about a few specific advertisements, it appears to have done so to illustrate the ongoing pattern. It is clear from the record the State meant to show that Ms. Zimmerman "engage[d] in a series of

actions intended to secure the same objective" of advancing Ms. D.'s prostitution, rather than "several distinct [criminal] acts." *Fiallo-Lopez*, 78 Wn. App. at 724. This is a continuing course of conduct case.

In *McNearney*, this court rejected a similar belated *Petrich* challenge. *McNearney*, 193 Wn. App. at 138. There, McNearney was charged with one count of assault with sexual motivation. *Id.* at 139. The victim testified that McNearney touched her vaginal area and a surveillance video showed he touched her stomach, moments later. *Id.* The State did not elect which touching formed the basis for the charge and McNearney did not request a *Petrich* instruction or object to the jury instructions. *Id.* at 139-40. The jury found McNearney guilty, and he appealed. *Id.* at 140.

On appeal, McNearney alleged the touchings were separate and distinct due to a break in time and change in location, and it was error not to give a unanimity instruction when the State did not elect which act it relied on. *Id.* at 143. We declined to review the challenge because McNearney failed to demonstrate any alleged constitutional error was manifest. *Id.* at 142, 144. We explained that "we do not engage in the analysis the trial court would have conducted if Mr. McNearney had proposed a *Petrich* instruction or objected and thereby brought the unanimity issue to the trial court's attention." *Id.* at 143.

21

Instead, "[w]e focus on what was manifest where no objection was raised and no such arguments were made." *Id.*

In determining the error was not manifest, we reasoned "it was not at all apparent that the two touchings could be viewed as separate acts, as opposed to a continuing course of conduct." *Id.* at 142-43. Both were preceded by a sexual innuendo, occurred around the main floor of a hotel, and "were a part of an ongoing crass and demeaning 'flirtation/molestation'" taking place while McNearney finished his drink. *Id.* at 143.

We also reasoned that the trial court would not have reasonably expected McNearney to argue the two touchings were separate and distinct; if he conceded his conduct supported more than one charge, the State may have moved to amend the information. *Id.* at 143-44. A second conviction would expose him to more criminal liability, thus his acquiescence to the jury instructions would have seemed appropriate to the trial court. *Id.* at 144.

The reasoning in *McNearney* applies. Although there are factual differences in the cases, neither defendant objected to the instructions nor argued unanimity below. Both cases involve an unpreserved *Petrich* challenge where there is evidence of a continuing course of conduct. Thus, like in *McNearney*, we need not engage in the full analysis of whether the acts were separate and distinct, as the trial court would have if Ms.

Zimmerman had raised the issue. It is enough that there was evidence of a continuing course of conduct, which is a valid basis for a charge of promoting prostitution under *Elliott*.

Moreover, putting ourselves in the trial court's position, we could not anticipate that Ms. Zimmerman's counsel would argue the evidence supported numerous felonies rather than the one charged. Like McNearney, if Ms. Zimmerman argued her conduct was not continuous but was instead separate and distinct acts of advancing prostitution, it would have been seen as a concession that the evidence supported numerous charges. This would have exposed Ms. Zimmerman to substantially more criminal liability; thus, her acquiescence to the jury instructions would have seemed reasonable to the trial court.

Ms. Zimmerman cannot establish the alleged constitutional error is manifest, i.e., so obvious from the record as to warrant review, and it does not meet any other exception. Therefore, it is not properly preserved for review.

No. 38259-1-III
*State v. Zimmerman*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____     _____
Siddoway, C.J.                                      Pennell, J.