# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

                Respondent,

      v.

DARREN GENE LAW,

                Appellant.

No. 78677-6-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: March 23, 2020

APPELWICK, C.J. — Law appeals his conviction for possession of methamphetamine with intent to manufacture or deliver. He argues that the trial court violated his right to a unanimous jury verdict, because it failed to instruct the jury that it had to unanimously agree on which of two acts supported the conviction. He contends that the trial court erred in denying his motion to dismiss the charge based on governmental misconduct. And, he asserts that the provision in his judgment and sentence imposing interest on nonrestitution LFOs must be struck. We affirm Law's conviction, but remand to the trial court to strike the provision requiring interest accrual on nonrestitution LFOs.

## FACTS

On August 15, 2017, Everett police engaged in an "open-air drug market interdiction." As a part of this effort, Officer Oleg Kravchun conducted surveillance at Clark Park. He saw Darren Law arrive at the park and approach an individual lying in a grassy area. As Law approached, the individual got up. Law then

reached into his right cargo shorts pocket, retrieved a powdery substance, and sprinkled the substance into the individual's hand. The substance appeared white or clear. At that point, the two bumped fists, and the individual immediately left the park.

After that exchange, a second individual entered the park and approached Law. Law gave the individual something small from the same right cargo shorts pocket, and the individual ran out of the park. A third individual then entered the park. When he made contact with Law, Law reached into the same right pocket and sprinkled a substance into the individual's hand. The third individual quickly left the park as well. Law then gave two more individuals something small from the same right pocket. During the last exchange, Law was given a green, folded up paper that Kravchun believed to be currency. Law then left the park.

Police arrested Law nearby. In a search incident to arrest, they found a loose crystal substance that appeared to be methamphetamine in his right cargo shorts pocket. They also found a sandwich bag containing a substance that appeared to be methamphetamine in his left front pocket. The sandwich bag was tied off at the end. The substance in the sandwich bag in Law's left pocket later tested positive for methamphetamine. The loose crystal in his right pocket was never tested.

Police also searched a backpack Law was carrying. Inside, they found a digital scale and about half a dozen small, ziplock style "baggies." The baggies were empty, and consistent with the type that police often find in the drug trade.

2

Last, police found that Law had a cell phone on him. A case report describing the arrest indicated that they intended to obtain a search warrant for the phone.

On August 18, 2017, the State charged Law with possession of a controlled substance with intent to manufacture or deliver. On August 22, an attorney filed a notice of appearance on Law's behalf. Defense counsel received a copy of the case report mentioning the intent to obtain the search warrant.

On October 3, 2017, Kravchun filed an affidavit for a search warrant for Law's cell phone. The affidavit described different methods that could be used to conduct the search:

> JTAG [(Joint Test Action Group)], ISP [In-System Programming)] and "chip off" are separate processes that may be performed on damaged devices, security protected devices (prohibiting access to the device), devices that do not have debugging mode enabled, and/or devices not fully supported by non-destructive forensic tools or software and/or when a logical extraction is not sufficient.
>
> JTAG and ISP are non-destructive processes in which the device's memory is accessed via points located on the mainboard. The memory is then extracted using a supported memory box, reader or adaptor.
>
> A "chip off" examination is a destructive process in which the physical memory is removed from the mainboard of the device, cleaned, and the binary memory is extracted using a supported memory box, reader, or adaptor.
>
> The "chip off" process involves the use of heat to physically remove the chip from the seated area on the board and permanently renders the device inoperable. Mobile electronic devices are extremely complex so there is always a risk that the memory chip may be permanently damaged and rendered unreadable during a chip off examination.
>
> JTAG and ISP are usually attempted prior to performing a "chip off" extraction; however not all devices are supported.

3

A judge issued a warrant the same day, authorizing the JTAG, ISP, and chip off methods. Neither the prosecutor nor defense counsel received notice of the application motion nor issuance of the warrant at the time.

Detective Steve Paxton proceeded to conduct a search of Law's cell phone. The JTAG and ISP search methods were not successful. Therefore, he used the chip off method. The chip off was successful. But, Paxton was unable to read the memory chip or extract any data stored within the chip, effectively ending his examination. The procedure rendered Law's phone inoperable. Paxton and Kravchun both completed case reports concerning the search. Kravchun uploaded his report to the Everett Police Department's computer system. He thought that a detective would send the report to the prosecutor's office. However, this never occurred.

Before trial, defense counsel interviewed Kravchun. Defense counsel did not ask Kravchun any questions about whether he had obtained a search warrant for Law's cell phone, and Kravchun did not raise the subject. By uploading his report about the search, Kravchun believed that the prosecutor, who was at the interview, already had this information. Neither the prosecutor nor defense counsel received information about the search before trial.

Trial began on February 5, 2018. That day, defense counsel cross-examined Kravchun about his intention to obtain a search warrant for Law's cell phone:

> Q. One of the items that you entered into evidence in this case is a phone, a cellular phone; right?

4

A.     Yes.

Q.     And you attributed ownership of that phone to Mr. Law; right?

A.     Yes.

Q.     And you said that it was your plan to seek a search warrant for the contents of that phone; correct?

A.     Correct.

Q.     And the reason you wanted to seek a search warrant for the contents of that phone is that you wanted to see if people were asking Mr. Law for drugs; right?

A.     Correct.

Q.     To see if there were any text messages in that phone requesting drugs; right?

A.     Yes.

Q.     Okay. No search warrant was ever granted in this case; right?

A.     It was.

Defense counsel then asked to be heard outside the presence of the jury. He and the prosecutor both told the trial court that they knew nothing about the search of Law's cell phone. The court took a recess so that the prosecutor could speak with Kravchun. During the recess, the prosecutor learned that Kravchun had completed a follow up report that he did not receive. The prosecutor explained this to the court, and defense counsel received a copy of the search warrant within a few minutes. He also received copies of Paxton's and Kravchun's reports about the search. Law then moved for a mistrial. The court granted his request, and set the case for retrial on April 27, 2018.

On April 24, 2018, Law moved to dismiss the case. He relied in part on CrR 8.3(b), which allows the trial court dismiss a criminal prosecution due to arbitrary action or governmental misconduct. The court denied Law's motion. At the hearing on the motion, it explained,

> I don't think I can find that the failure to disclose rises to the level of government misconduct. I certainly can't find that there was anything intentional about it. So there would have to be such gross mismanagement that that establishes misconduct. And I don't think I have found that on the record I have. I'm going to admit there are some gaps I think in exactly what happened, but I don't think I can fill them in by assuming something improper happened without more.
>
> So then, you know, the question has to be more a question of the issue, more a question of whether or not the destruction of the ability to ever access what was on the phone rises to some level that the defendant is entitled to have this case dismissed.
>
> Again, I don't think that the case law supports finding that simply because -- again, it's not as if I can find they intentionally destroyed the phone. I don't think that was their intent. I think the record makes it pretty clear they hoped to get inculpatory evidence. And I think you're right, what you're saying is the more appropriate way to handle it, that you can cross-examine about it, you may be entitled to some instruction about it.

The new trial began on May 22, 2018. Kravchun and Paxton both testified. During Kravchun's direct examination, he testified that he had obtained a search warrant for Law's cell phone, but that Paxton was not "able to get much information, anything that [he] could use, off of the phone." Defense counsel cross-examined Kravchun regarding his failure to inform the prosecutor that he was seeking a search warrant for the phone, and that he had received authorization to search the phone. Paxton testified that, despite the successful chip off procedure, he was unable to get any data from the phone's chip.

After the State rested, the trial court read the following instruction to the jury: "The State introduced evidence of an untested substance, to wit: a crystal, found in Mr. Law's right cargo shorts pocket. This evidence is not sufficient on its own to support a finding that Mr. Law possessed a controlled substance." The court also instructed the jury, "[I]f you find that the State has allowed to be destroyed or lost any evidence whose content or quality are an issue, you may, but are not required to, infer that the lost evidence is against the State's interest."

The jury found Law guilty as charged. The trial court sentenced him to 85 months of confinement and 12 months of community custody. It also imposed a $500 victim assessment. Law's judgment and sentence provided that the legal financial obligations (LFOs) imposed "shall bear interest from the date of the judgment until payment in full."

Law appeals.

## DISCUSSION

Law makes three main arguments. First, he argues that the trial court violated his right to a unanimous jury verdict, because it failed to instruct the jury that it had to unanimously agree on which act supported conviction. Second, he argues that the trial court erred in denying his motion to dismiss the charge based on governmental misconduct. Third, he argues that the provision in his judgment and sentence imposing interest on nonrestitution LFOs must be struck.

I.   Unanimity Instruction

Law argues first that the trial court violated his right to a unanimous jury verdict. He contends that the evidence described two distinct acts, the prosecutor relied on both acts, and the instructions did not require the jury to unanimously agree on which act supported conviction.[1]

"Where the State presents evidence of several distinct acts, any one of which could be the basis of a criminal charge, the trial court must ensure that the jury reaches a unanimous verdict on one particular incident." State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989). But, this rule applies only where the State presents evidence of several distinct acts. Id. "[T]he State need not make an election and the trial court need not give a unanimity instruction if the evidence shows the defendant was engaged in a 'continuing course of conduct.'" State v. Fiallo-Lopez, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995) (quoting Handran, 113 Wn.2d at 17).

To determine whether criminal conduct constitutes one continuing act, we evaluate the evidence in a commonsense manner. Handran, 113 Wn.2d at 17. "[E]vidence that the charged conduct occurred at different times and places tends

---

[1] Law failed to raise this alleged error below. A party may raise for the first time on appeal a manifest error affecting a constitutional right. RAP 2.5(a)(3). This court has previously held that, "[b]ecause . . . the test for determining whether an alleged error is 'manifest' is closely related to the test for the substantive issue of whether a Petrich [unanimity] instruction was required, we conflate these two analyses." State v. Knutz, 161 Wn. App. 395, 407, 253 P.3d 437 (2011) (citing State v. Petrich, 101 Wn.2d 566, 683 P.2d 173 (1984), overruled on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988)). Accordingly, we reach the issue under Knutz.

to show that several distinct acts occurred." Fiallo-Lopez, 78 Wn. App. at 724. On the other hand, evidence that a defendant engaged in a series of actions intended to secure the same objective supports a continuing course of conduct. Id.

Law relies on State v. King, 75 Wn. App. 899, 878 P.2d 466 (1994). There, police stopped a car in which King was a passenger. King, 75 Wn. App. at 901. As King stepped out of the car, one of the officers saw him toss something away. Id. The officer also saw that his fanny pack was open, despite having been closed just moments before. Id. As the driver stepped out of the car, another officer saw him make a throwing motion in the direction of the car's interior. Id. One of the officers then searched between the driver and passenger seats, and found a Tylenol container with rock cocaine inside. Id. They arrested King as a result.[2] Id. Upon arrival at the police station, an officer found another piece of rock cocaine in King's fanny pack. Id. The State charged King with only one count of possession of cocaine. Id. At trial, King requested a written unanimity instruction. Id. at 903. The trial court denied his request due to "the State's avowed intention to make an election in argument." Id. However, the State offered both the Tylenol bottle and the fanny pack as a basis for conviction. Id. A jury found King guilty as charged. Id. at 902.

On appeal, this court found that the State's evidence did not tend to show a continuing course of conduct. Id. at 903. It explained, "The State's evidence tended to show two distinct instances of cocaine possession occurring at different

---

[2] Police had already arrested the driver based on an outstanding warrant. King, 75 Wn. App. at 901.

times, in different places, and involving two different containers-the Tylenol bottle and the fanny pack. One alleged possession was constructive; the other, actual." Id. Because the State did not elect to rely on either the Tylenol bottle or the fanny pack as a basis for conviction, this court could not "say that the jury acted with unanimity as to one act of possession." Id. Thus, it held that the trial court's failure to issue a unanimity instruction amounted to constitutional error. Id.

Law also attempts to distinguish this case from Fiallo-Lopez and State v. Love, 80 Wn. App. 357, 908 P.2d 395 (1996). In Fiallo-Lopez, Lima delivered a sample of cocaine to a police informant at a restaurant. 78 Wn. App. at 720. The two then met at a Safeway parking lot, where Lima delivered a bag of cocaine. Id. at 722. Lima later agreed to work with police and told them that Fiallo-Lopez supplied the cocaine for these transactions. Id. at 721, 723. The State charged Fiallo-Lopez with one count of delivery of cocaine, and one count of possession of cocaine. Id. at 723. A jury found him guilty as charged. Id. On appeal, Fiallo-Lopez argued that he was entitled to a unanimity instruction as to the delivery charge. Id. This court disagreed, holding that "the testimony and other evidence show that the drug transaction was a continuing course of conduct." Id. at 725. It noted that "the fact that the two deliveries here occurred at different times and places is outweighed by the commonsense consideration that they were both intended for the same ultimate purpose, delivery of cocaine by Fiallo-Lopez to [the informant]." Id. at 726.

10

In Love, police were conducting surveillance of Love's residence in preparation to execute a search warrant, when Love exited the residence. 80 Wn. App. at 358. Police stopped him a few blocks away, and arrested him after finding 5 rocks of cocaine inside a container in his pocket. Id. at 359. In a subsequent search of Love's residence, police found 40 additional rocks of cocaine and drug paraphernalia. Id. The State charged Love with one count of possession of a controlled substance with intent to deliver. Id. at 362. A jury found him guilty as charged. Id. at 360.

On appeal, Love argued that the trial court erred in failing to give the jury a unanimity instruction. Id. This court disagreed, distinguishing the case from King. Id. at 362-63. It explained,

> Love's possession of five rocks of cocaine on his person and the forty rocks in his residence, when considered in conjunction with the other evidence of an ongoing drug trafficking operation found at Love's residence, reflect his single objective to make money by trafficking cocaine; thus, both instances of possession constituted a continuous course of conduct.

Id. at 362. This court further explained that, in King, a rational juror could have believed that the cocaine found in the car belonged to the driver, and that the cocaine found in the fanny pack belonged to King. Id. at 363. In contrast, an equally rational juror could have believed that King constructively possessed the cocaine found in the car , and that, as King claimed, the police planted the cocaine in his fanny pack. Id. Love had also argued that the police planted the cocaine found in his pocket and at his residence. Id. But, as this court noted, the jury was

11

left "with no rational basis to distinguish the cocaine found on Love from that at his home." Id.

This case is more like Fiallo-Lopez and Love. While at the park, Law sprinkled a substance from his right pocket into multiple individuals' hands. He also gave multiple individuals something small from the same pocket. At one point, Law was given a folded up paper that appeared to be currency. After he left the park, police arrested him nearby. They found a loose crystal substance in his right pocket that appeared to be methamphetamine. They found a tied off sandwich bag in his left pocket with methamphetamine inside. They also found a digital scale and half a dozen small, ziplock style baggies in his backpack.

This evidence indicates that Law engaged in a series of actions intended to achieve a single objective: make money by selling methamphetamine. Despite their placement in different pockets, Law possessed the methamphetamine and untested crystal at the same time and place. A jury could infer that Law would eventually use the methamphetamine in his left pocket to refill the drugs he was handing out from his right pocket. Viewing the evidence in a commonsense manner, the methamphetamine found in Law's left pocket and the crystal found in his right pocket were part of a continuing course of conduct. As a result, a unanimity instruction was not required.[3]

---

[3] In the alternative, Law argues that his trial counsel was ineffective for failing to alert the trial court to the need for a Petrich unanimity instruction. To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness based on consideration of all the circumstances, and that the deficient performance prejudiced the trial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052,

II.    Motion to Dismiss for Governmental Misconduct

Law argues second that the trial court erred in denying his CrR 8.3(b) motion to dismiss the charge. He asserts that the State failed to notify him that (1) it had sought and obtained a warrant to search his cell phone, and (2) it was "preparing to engage in an invasive procedure that would render the phone and data inaccessible." He contends that this failure constituted governmental mismanagement warranting dismissal.

Two things must be shown before a trial court can dismiss a charge under CrR 8.3(b). State v. Puapuaga, 164 Wn.2d 515, 520, 192 P.3d 360 (2008). First, "a defendant must show arbitrary action or governmental misconduct." Id. Second, "a defendant must show prejudice affecting the defendant's right to a fair trial." Id. Washington courts have maintained that dismissal is an "extraordinary remedy to which the court should resort only in 'truly egregious cases of mismanagement or misconduct.'" State v. Wilson, 149 Wn.2d 1, 9, 65 P.3d 657 (2003) (quoting State v. Duggins, 68 Wn. App. 396, 401, 844 P.2d 441, aff'd, 121 Wn.2d 524, 852, P.2d 294 (1993)). We review a trial court's decision on a motion to dismiss charges for manifest abuse of discretion. Puapuaga, 164 Wn.2d at 520-21.

---

80 L. Ed. 2d 674 (1984); State v. Nichols, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007). If one of the two prongs of the test is absent, this court need not inquire further. Strickland, 466 U.S. at 697; State v. Foster, 140 Wn. App. 266, 273, 166 P.3d 726 (2007). Because a unanimity instruction was not required, defense counsel's failure to request one did not fall below an objective standard of reasonableness. Accordingly, Law's trial counsel was not ineffective.

Law relies primarily on State v. Brooks, 149 Wn. App. 373, 203 P.3d 397 (2009), to support that the State's failure to notify constituted governmental misconduct. In Brooks, the State failed to provide discovery required under CrR 4.7 before the defendants', Natalie's and Jason's, omnibus hearings. 149 Wn. App. at 383, 386. Specifically, the State did not provide any discovery, including the names and addresses of its witnesses or any witness statements, before the first scheduled hearing date. Id. at 386. Further,

> The State failed to timely provide Jason's statement. The State failed to follow the local practice of making essentially all of the police file available to the defense by the omnibus date . . . . The State mismanaged the first CrR 3.5 hearings by failing to issue subpoenas for its witnesses. The State continued to provide stacks of discovery on the mornings of the rescheduled hearings, thus forcing the trial court to continue the hearings multiple times. The trial court continued Natalie's trial twice and Jason's trial once to allow the State to complete its discovery obligations, which it still did not do.

Id.

The trial court found that "the lag time between the date of the incident and the date the officers transcribed the report and witness statements was beyond the prosecutor's control." Id. In some cases, this lag time was about a month and a half. Id. at 382. But, the court indicated that "there was no evidence that the prosecutor's office attempted to work with the sheriff's office to resolve the lag time." Id. at 386. Also, the State took nine more days from the time it received several officer statements before providing those statements to defense counsel. Id. The trial court found governmental misconduct and prejudice under CrR 8.3(b), and granted the defendants' motions to dismiss with prejudice. Id. at 383. On

14

appeal, this court held that, "[e]ven without considering the time that the sheriff's office controlled the requested documents, the trial court did not abuse its discretion by finding governmental misconduct." Id. at 387.

There is no dispute that the State failed to notify Law that police had obtained a search warrant for his phone until the first trial, and that the chip off procedure rendered the phone inoperable. The record does not explain why the prosecutor did not follow up regarding the status of a search warrant, despite Kravchun's statement that police intended to seek one. But, the trial court's ruling emphasized that nothing in the record showed that any mismanagement by the State was intentional. Yet, CrR 8.3(b) does not require that governmental misconduct be intentional.

The State's failure to notify Law about the search warrant does not appear as egregious as failing to provide any required discovery before a court proceeding. At the defense interview before trial, defense counsel did not ask about Kravchun's statement in his report that police intended to seek a search warrant for Law's phone. And, under CrR 4.7(a)(4), the State's discovery obligations are limited to "material and information within the knowledge, possession or control of members of the prosecuting attorney's staff." The record indicates the existence of the search warrant was unknown to the prosecutor and his staff until the first trial. They could not produce what they did not have.

But, even if the State's actions had constituted governmental misconduct, Law has failed to show prejudice as a result of this misconduct. Once Law learned

of the search warrant, the trial court granted him a mistrial. At the new trial, Kravchun testified that he had obtained a search warrant for Law's cell phone, but that Paxton was not "able to get much information, anything that [he] could use, off of the phone." Defense counsel cross-examined Kravchun about the lack of communication between police and the prosecutor. Paxton testified that, despite the successful chip off procedure, he was unable to get any data from the phone's chip. Thus, the jury was able to consider this evidence, including the State's failure to get any information off of Law's phone.

Law argues that the chip off procedure destroyed material evidence, thereby prejudicing his right to a fair trial. He points out that his phone could have contained exculpatory evidence, and that, even if the phone contained "nothing" relating to the charge, "that too would be exculpatory evidence."[4] But, the misconduct at issue has to do with the State's failure to notify Law of the warrant and resulting search of his phone—not Paxton's use of the chip off procedure. A judge issued a warrant authorizing use of the procedure. Even if Law knew of the warrant before Paxton conducted the search, he cites no rule that would have prevented police from using the procedure to search Law's phone.

And, the State's case against Law originated from police surveilling "open-air drug market" transactions. The State did not claim that Law engaged in any prearranged transactions. Law has not identified information that the phone may have provided that was material to a defense to the charges. Accordingly, the

---

[4] Nothing in the record suggests that defense counsel attempted to obtain evidence from Law's phone that could have been exculpatory before the first trial.

absence of information about prearranged transactions on Law's phone would not materially affect the case against him.

Law also asserts that he "was prejudiced because he was forced to choose between having prepared counsel and proceeding with a speedy trial." CrR 3.3(h) provides, "No case shall be dismissed for time-to-trial reasons except as expressly required by this rule, a statute, or the state or federal constitution." This court has previously held that "[t]he plain and unambiguous language of CrR 3.3 prohibits dismissal of a case under CrR 8.3(b) for violation of a defendant's time-for-trial rights under CrR 3.3 unless a defendant can show a violation of CrR 3.3, a statute, or the state or federal constitution." State v. Kone, 165 Wn. App. 420, 436, 266 P.3d 916 (2011). Further, "CrR 3.3(b) provides the exclusive means to challenge a violation of the time-to-trial rule." Id. at 437. Law has not asserted a specific violation of CrR 3.3. Nor has he asserted a violation of a statute or his constitutional rights. Therefore, he is precluded from raising his time-to-trial argument under CrR 8.3(b).

Because Law has failed to show prejudice as a result of governmental misconduct, the trial court did not abuse its discretion in denying his motion to dismiss.

III.    Legal Financial Obligations

Law argues last that the trial court erred in imposing interest on nonrestitution LFOs. He cites RCW 10.82.090(1), which provides, "As of June 7, 2018, no interest shall accrue on nonrestitution legal financial obligations." Law

17

was sentenced on July 5, 2018. The State concedes that remand is appropriate to strike the provision in his judgment and sentence requiring interest accrual on nonrestitution LFOs. We accept the State's concession and remand for the trial court to strike the provision.

We affirm Law's conviction, but remand to the trial court to strike the provision requiring interest accrual on nonrestitution LFOs.

WE CONCUR: